WILLIAM L. OSTERHOUDT (SBN 043021)
Law Offices of William L. Osterhoudt
135 Belvedere Street
San Francisco, CA 94117
Tel: (415) 664-4600
Fax: (415) 664-4691
Email: Osterhoudt@aol.com

GAIL SHIFMAN (SBN 147334)
Law Office of Gail Shifman
2431 Fillmore Street
San Francisco, CA  94115
Tel: (415) 551-1500
Fax: (415) 551-1502
Email:  gail@shifmanlawgroup.com

Attorneys for Defendant,
ARNOLD FISCHMAN


UNITED STATES DISTRICT COURT,

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | NO. CR- 16-0246 HSG |
| Plaintiff, | ) ) | **DEFENDANT ARNOLD FISCHMAN'S SENTENCING MEMORANDUM** |
| v. | ) ) | |
| ARNOLD FISCHMAN, | ) ) | Date:  February 13, 2017 Time:  2:00 p.m. |
| Defendant. | ) ) ) | Place: Honorable Haywood S. Gilliam |

i

**TABLE OF CONTENTS**

Page

INTRODUCTION ......................................................................... 1

DISCUSSION ............................................................................. 1

I.    History and Characteristics of the Defendant ......... 2

      A.    Lifelong Commitment to the Cause of
            Affordable Housing .......................................... 2

      B.    Family and Community Responsibilities ............... 6

      C.    Breast Cancer Over Time ................................. 8

II.   Determining an Appropriate Sentence for
      Mr. Fischman ...................................................... 11

            A.    The Child Pornography Sentencing
                  Guidelines Are Deeply Flawed and Can
                  Be Rejected by the Court ....................... 12

            B.    The Relevant Sentencing Factors in
                  § 3553 Militate in Favor of a Sentence
                  Well Below the Sentencing Guidelines
                  and Lower than that Recommended by
                  the United States Probation Office ......... 23

                  1.    Post Offense Rehabilitation ............... 23

                  2.    Aberrant Behavior ........................... 26

                  3.    Difficult Childhood/Lack of
                        Youthful Guidance ........................... 27

                  4.    Community Service and Employment
                        History ........................................ 28

III.  The Pre-Sentence Report ...................................... 28

IV.   The Court's Sentencing Discretion Should Reflect
      Mr. Fischman's Enormous and Ongoing Contributions
      to the Public Good, the Integrity and Compassion
      with Which He Has Lived His Life, and His
      Significant Post-Offense Rehabilitation ...................... 29

Conclusion ............................................................................ 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Kimbrough v. United States*, 552 U.S. 82(2007)........................... 12,13,16

*Pepper v. United States*, 131 S. Ct. 1229(2011)........................ 24,25,26

*United States v. Apodaca*, 641 F.3d 1077(9th Cir. 2011)…   21

*United States v. Baird,* 580 F. Supp.2d 889(D. Neb. 2008).   17

*United States v. Brasfield,* 2011 WL 3844181
(E.D. Wis. Aug. 29, 2011).................................................   17

*United States v. Dorvee*, 616 F.3d 174(2d Cir. 2010)............   17

*United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991)......   27

*United States v. Grober,* 624 F.3d 592(3d Cir. 2010)............   17

*United States v. Hanson*, 561 F. Supp. 2d 1004
(E.D. Wis. 2008)...........................................................   18,20,21

*United States v. Henderson,* 649 F.3d 955(9th Cir. 2011).   passim

*United States v. Ontiveros*, 2008 WL 2937539(E.D. Wis. 2008)   17

*United States v. Pauley*, 511 F.3d 468(4th Cir. 2007)........   27

*United States v. Stall,* 81 F.3d 276(6th Cir. 2009)..............   27

*United States v. Stone,* 575 F.3d 83(1st Cir. 2009) ........   17

*United States v. Tutty,* 612 F.3d 128(2d Cir. 2010)............   17

*United States v. Walter*, 256 F.3d 891 (9th Cir. 2001)......   27


**Other Authority**

18 U.S.C. § 3104 ........................................................   28

18 U.S.C. § 3553 ........................................................   passim

U.S.S.G. 2G2.2 ........................................................   passim

**INTRODUCTION**

Arnold Fischman is to appear before this Court on February 13, 2017 for sentencing on the single count of possession of child pornography to which he has entered a guilty plea. We begin this sentencing memorandum with a recognition that Mr. Fischman's offense is a serious one, a deeply troubling departure from a life otherwise well-lived in service to others and to the community. Mr. Fischman is profoundly remorseful for this conduct. He is, however, an extraordinary individual as evidenced by the 46 letters from persons in all walks of life, which are attached as Exhibit A to this memorandum. Since a search warrant for computer evidence was served at his residence two years ago, Mr. Fischman has not only continued to work tirelessly to advance the positive conduct for which he is well-known, but has also compiled a strong record of post-offense rehabilitation, including intensive psychotherapy through which he has developed an understanding of his offense behavior and a firm resolve that it never be repeated. We respectfully ask the Court to view Mr. Fischman as a complete person and to take into consideration his strong personal qualities and history of service to those in need of affordable housing in determining the appropriate sentence in this case.

**DISCUSSION**

The letters submitted to the Court as Exhibit A and the Sentencing Video as Exhibit B present an unvarying picture of

1

Arnie Fischman as an enlightened, public-spirited advocate for the poor and disadvantaged, a devoted family man who has nurtured his son through the trauma of the untimely death of his mother, a trusted and valued friend and a person of humility, generosity and integrity. Drawing upon the heartfelt comments of those who wrote these letters, we shall attempt to highlight those aspects of Mr. Fischman's conduct through the years that demonstrate his great value as a human being and which may assist this Court in its sentencing decision.

**I. History and Characteristics of the Defendant**

**A. Lifelong Commitment to the Cause of Affordable Housing**

John Isbister, professor of economics at Ryerson University in Toronto, has known Arnie Fischman for 45 years, since Arnie's days as a graduate student at the University of California's Santa Cruz campus where Professor Isbister was on the faculty. Professor Isbister worked with Mr. Fischman on the board of a community based credit union in Santa Cruz dedicated to improving the lives of low and moderate income people in Santa Cruz County. He early observed and came to admire "the skillful way in which [Arnold] was able to translate his social values into actual policies and make them work." Professor Isbister writes:

> In 2007 I wrote a short memoire, not for publication but just for family and friends. In it I included brief portraits of my closest friends. About Arnie's work in housing I wrote: "he became one of the leading low-income housing developers in the area, the consequence being that his accomplishments are visible in a way that

2

most of our accomplishments are not. Cooperative and low—income housing projects in Santa Cruz and Monterey counties, homes that make life possible for ordinary folks in a region where private housing prices are outrageous, are his legacy. Without him, they wouldn't be there."

Ancel Romero, president of a non-profit affordable housing organization serving over 2,000 low-income seniors in California and Washington State, writes in the same vain, pointing out that "over 400 low-income seniors would either be homeless or living in sub-standard housing without his valued contributions. According to Romero, Arnie's contributions have gone beyond the complex and multi-facetted projects he has put together, volunteering countless hours mentoring others in the affordable housing field. These volunteer efforts included organizing industry-sponsored workshops aimed at improving the technical skills of housing developers nationwide. As Romero says "[d]ozens of housing providers would not have reached their full potential if not for the knowledge and inspiration that only someone like Arnie could provide."

This work, as these letter writers attest, is extremely complicated, requiring that funding sources be brought together with builders, lawyers and regulators in a way that produces affordable housing. Wendy Brown, a professor of political science at University of California, Berkeley, has known Mr. Fischman since 1977 when they met through common interests in community organizing. Arnie introduced Professor Brown to the world of low-

income housing politics when she was just beginning to work in the field. She writes:

> Arnie's four decades of work in low income housing development and cooperatives is a remarkable study in taking an abstract principle – "every family ought to have decent and secure shelter" – and turning it into concrete reality. Arnie taught himself the legal, financial, and governmental dimensions of low-income housing development, and proceeded to work with countless government agencies, neighborhood organizations, charities and churches, planning and zoning boards, and local politicians to develop genuinely affordable and dignified housing for poor and working class households. For over a decade, Arnie was the executive director of the Community Housing Corporation in Santa Cruz and, today, Santa Cruz boasts far more affordable housing than it would have had CHC not existed. Of particular note is the Neary Lagoon Housing Corporation in Santa Cruz, a self-governing community comprising nearly 100 low income apartments which is a model for the industry.

Throughout this work Mr. Fischman has been particularly sensitive to the needs of minority communities. Cindy Heavens, Community Development Specialist with the City and County of San Francisco's Mayor's office has known Mr. Fischman for 19 years, beginning in 1996 when she was a participant in the Northern California Non-profit Housing Association's ("NPH") minority fellowship training program. Mr. Fischman was then a co-coordinator of the program, teaching workshops and acting as a mentor. Ms. Heavens writes:

> Arnie's teaching and mentorship are directly related to my current position. The NPH training program was key to becoming a project manager in affordable housing without a master's degree. . . . Arnie noticed that many of the communities served by non-profit housing associations provided housing to people of color,

4

however, many people in the decision-making positions were not people of color. Arnie, with NPH, studied this occurrence, analyzed the salaries of various positions, and organized a training program that trained people of color to become project managers, which later put them in position to be key decision-makers in affordable housing and community development agencies.

* * *

As the co-coordinator and trainer of the NPH training program, Arnie was thoughtful, respectful and encouraging, as people of color voiced concerns and complaints to him about community development work and/or the organizations we were training under. Arnie never patronized us. He always acknowledged our feelings and growing skills and respected that as people of color we could, based on our life experience, notice that some people may be interacting with us out of their own preconceptions. Yet, he challenged whether some of our observations or assumptions were based on actual character or skill development and not from someone perceiving us as an outsider. As a Caucasian, Arnie's position and effectiveness required delicacy, self-awareness, and knowledge of the historical and cultural context of the training program participants. Arnie was impressive and I found him more astute than some of my former college professors.

Mike Rotkin, five-time former Mayor of Santa Cruz and former director of a field study program at the University of California, Santa Cruz, has had extensive experience working with Mr. Fischman on a wide variety of educational and community projects over several decades. He sounds the same theme as Ms. Heavens, writing that "Arnie has been a tireless advocate for and producer of affordable housing for low-income renters, and especially for low-income renters of color, disabled individuals, the elderly, and single parent families since the mid-1970s."

It is important to emphasize that Mr. Fischman did not undertake this difficult and complicated work for financial remuneration. Kate Comfort Harr, Executive Director of a non-profit housing corporation in San Mateo, first notes that "as a result of [Mr. Fischman's] efforts, hundreds of low-income people now have a place to call home." She notes, however, that personal financial gain from this kind of work is minimal: "you do the work because you believe it is important and because it makes our communities better places to live." Mr. Fischman has spent his entire adult life and career making the dream of affordable housing become a reality for countless people and he has done this with unfailing kindness, generosity and compassionate, as well as great skill.

**B.   Family and Community Responsibilities**

Throughout this productive if taxing career in affordable housing, Mr. Fischman has fully committed himself to his son Max, now 19 year old and a college student. All of the letter writers to address the subject comment on Arnie's devotion to Max (see letter of John Isbister). Wendy Brown, who has known Arnie since 1977, writes that Arnie "brought to parenting the same unqualified love, commitment and attention to detail that he brought to his work in housing development." She has observed Arnie as a "rare and wonderful parent, one who could accept a child's fears and weaknesses while helping him to become stronger." The sudden and

unexpected death of Max's mother and Arnie's partner, Tinka Gordon, in January 2015, while undergoing treatment for breast cancer, has obviously been traumatic for Max.  But, as Professor Brown writes, "[w]hile suffering from his own grief, Arnie has also done an extraordinary job of sheparding Max through this loss and helping him to pick up the pieces of his life."  This reaction is consistent with the support Mr. Fischman has always shown his son and with his commitment to education in the community.  As Jane Korich, a long-time family friend, states, Arnie was "a driving force in that community, helping in planning stages of the renovation of a building to accommodate middle-school students" at Park Day School. Kevin Knudtson, executive director of Community Economics, Inc., whose children attended the school, recalls that Arnie "was the longest serving member of the Board of Directors in the school's history, and lead important efforts to acquire and rehabilitate buildings the school now uses as its middle school." Mr. Knudtson writes that Arnie's abilities "ranging from affordable housing development to parent leadership at Park Day School demonstrated that Arnie cared about these issues deeply." Max himself has written a thoughtful letter to the Court expressing his love and appreciation for his father.

Throughout his life, Mr. Fischman has behaved toward other people with respect, compassion and integrity. These qualities shine through the many letters now submitted on his behalf. All

of these writers are aware of the present case and all of them deplore child pornography and are aware of the harm it causes. Nevertheless, they willingly wrote heartfelt letters of support because they know what kind of person Arnie Fischman is and are aware of the lives he has impacted in a positive way. The picture that emerges is of a kind, thoughtful, generous and compassionate man, who is esteemed by everyone who has known him through the years. All agree that his offense is a serious one, but they are gratified that he has addressed it by entering a course of intense therapy; no one who knows Arnie Fischman believes that this offense defines him as an individual because they are acutely aware of his excellent character and contributions to the community.  This offense conduct is completely at odds with the character he has always exhibited to them and inconsistent with the entire course of his life, and thus aberrant.

Dr. Bryant Welch has been treating Mr. Fischman since January 2015, beginning just days after the search of Arnie's home by federal law enforcement agents.  Dr. Welch's letter, filed as Exhibit C under seal, discusses in detail the course of Mr. Fischman's treatment and the high degree of success that has been achieved.

**C.   Breast Cancer Over Time**

Since Tinka Gordon's death in January 2015, during treatment of breast cancer, Mr. Fischman has become deeply involved in a

campaign to eradicate this terrible disease. Polly Marshall, one of Mr. Fischman's oldest and closest friends, has described these efforts in her letter to the Court. Ms. Marshall practiced law in Oakland for 30 years before leaving her firm in 2015. She left partly in response to a breast cancer diagnosis which was followed, as she relates in her letter, by surgery, chemo therapy and radiation treatments. She writes, "with Arnie's help, knowledge, and special skill as a consultant, I formed a non-profit corporation, Breast Cancer Over Time (BCOT), created and controlled by women living with breast cancer whose mission is to support research into breast cancer causation, to help prevent breast cancer in our own daughters, and other young women in the next generation." Ms. Marshall relates that without Arnie's help, this new organization would not be possible:

> The idea for this group was born immediately following, indeed from, the ordeal and the injustice of the death of Arnie's wife, Tinka. It was Arnie who brainstormed with me on the mission, purpose, and structure of the organization. It was Arnie who drafted the articles of incorporation and bylaws, prepared out State and federal income tax exemptions, and helped with the grant application period. It was Arnie who spearheaded our fundraising drive, who donated seed money to us, and helped us create the Tinka Gordon memorial fund. . . in memory of his wife to support our work. And it is Arnie who works with me on a daily basis to recruit volunteers, research the chemical makeup of cosmetic products, and administer the organization.

> . . .

> And I want to be very, very clear: Arnie has done all this, not to somehow mitigate the consequences of the criminal charges brought against him . . . but out of

9

love and grief for his deceased wife, dedication to our cause of eliminating breast cancer in the next generation of women, and friendship to me and the many others he knows who have been afflicted by this disease. Because this is the kind of person Arnie is – caring, dedicated to taking action to make the world a better place, and a true friend to those in need.

From all that has been presented herein, we can discern a clear pattern in Mr. Fischman's life.  That pattern consists of Mr. Fischman throwing himself into causes that help or promise to help the human condition whenever he is able to do so.  Observing the plight of low-income people, particularly minorities and people of color who lacked decent housing, he embarked on a decades long struggle to remedy their plight, and in the course became nationally known and respected in the field.  In the course of raising a son he learned of the needs of his son's school, an important community resource, for additional space and financing. Thereupon he devoted himself tirelessly to the arduous and difficult process of planning the space and obtaining the means to do the job.  And faced with the unexpected and tragic death of his wife (partner) in the throws of breast cancer treatment, he became a tireless advocate and worker devoted to the cause of eliminating that disease. That is the pattern of his life, not the deplorable images and chats that gave rise to these criminal charges.  In the context of Mr. Fischman's life, this offense conduct is, without question, an aberration.  That is not to say it should go unpunished; it is merely to recognize that it should not

extinguish or obscure the essential goodness of the man and the value of what he has achieved.

## II.  Determining an Appropriate Sentence for Mr. Fischman

Having in mind the extraordinary personal characteristics and accomplishments of Mr. Fischman, the Court must determine how these qualities and accomplishments impact the sentencing decision in this case. The touchstone of such analysis, of course, is found in 18 U.S.C. § 3553, which provides that the Court should impose a sentence which is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Under this mandate, the Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant. The cited factors in paragraph 2 include (1) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;(2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes by the defendant; and (4) to provide the defendant with needed educational or vocational training or medical care. The Court should consider the kinds of sentences available, and the sentencing range established by the Sentencing Guidelines. We examine first the last of these, pointing out basis defects in the child pornography guidelines that undermine their validity as a

sentencing tool.   We then examine the other factors more helpful in determining the sentence.

### A.   The Child Pornography Sentencing Guidelines Are Deeply Flawed and Can Be Rejected by the Court

In *Kimbrough v. United States*, 552 U.S. 82, 101 (2007), the Supreme Court upheld the District Court's discretion to vary from an otherwise correctly calculated Guidelines range "based solely on policy considerations, including disagreements with the Guidelines." *Id.* In *Kimbrough*, which dealt with the crack versus powder cocaine discrepancy, the Court recognized the distortions posed by Guidelines that were not developed by the U.S. Sentencing Commission from "empirical data and national experience, guided by a professional staff with appropriate expertise," but were rather based upon Congressional mandates, like the mandatory minimum sentences for crack cocaine cases, that did "not exemplify the Commission's exercise of its characteristic institutional role." *Id.* at 109. In such cases, sentencing courts may conclude that the Guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case." *Id.* at 110.

Following *Kimbrough,* numerous courts, including the Ninth Circuit, have applied this same analysis to the child pornography Guideline, holding that "a district court commits procedural error when it fails to appreciate its *Kimbrough* discretion to vary from the child pornography Guidelines based on a categorical disagreement with them." *United States v. Henderson,* 649 F.3d 955,

964 (9th Cir. 2011)(citing *United States v. Tutty,* 612 F.3d 128, 131 (2d Cir. 2010); *United States v. Stone,* 575 F,3d 83, 89 (1st Cir. 2009)).   In doing so, the Ninth Circuit in *Henderson* extensively reviewed the "anomalous history" of the child pornography Guideline. *Id.* at 960-62; *see also id.* at 964-65 (Berzon, J., concurring).   This anomaly resulted from the fact that the numerous sharp Guideline increases since the Guidelines initial adoption were driven by arbitrary congressional mandates, rather than reasoned deliberations of the Commission and its staff.

Specifically, *Henderson* begins by noting that, "[m]uch like policymaking in the area of drug trafficking, Congress has used a mix of mandatory minimum penalty increases and directives to [the U.S. Sentencing] Commission to change sentencing policy for sex offenses." *Id.* at 960 (citation and internal quotation marks omitted). The Ninth Circuit then traces the development of the child pornography guideline, U.S.S.G. § 2G2.2:

> • At the inception of the Guidelines in **1987**, simple possession of child pornography was not a crime and the relevant Guideline, § 2G2.2, was limited to "transporting, receiving, or trafficking" offenses. *Id.* The base offense level for these crimes was 13. *Id.*

> • The crimes of possession and possession with intent to sell were added in **1990**. *Id.* (citation omitted). The Commission responded by adding a new Guideline at § 2G2.4 to address receipt or possession of child pornography, while trafficking continued to be covered by § 2G2.2. *Id.* (citation omitted). The base offense level for trafficking offenses     was to be increased by two levels if the material involved a prepubescent

13

minor or a minor under the age of twelve years, and by four levels if the material portrayed sadistic of masochistic conduct. *Id.* (citation omitted). The base offense level for possession was 10 and there was a two-level enhancement if the material involved a prepubescent minor. *Id.*

• In **1991**, "over the objection of the Commission," Congress directed the Commission to increase penalties for child pornography offenses. *Id.* at 960-61 (citation omitted). In addition to changes to the trafficking guideline, the base offense level for possession was increased to 13 and an enhancement was added for the number of items possessed. *Id.* at 961.

• In 1995, Congress again directed the Commission to increase penalties for child pornography crimes by increasing the base offense levels by two and adding a two-level enhancement for use of a computer. *Id.* These amendments were adopted in **1996.** *Id.* However, in a report to Congress that same year, the Commission "criticized the two-level computer enhancement because it failed to distinguish serious commercial distributors from more run- of the-mill users." *Id.* In **2000**, further amendments enhancing the trafficking guideline were adopted in response to the "1998 Sexual Predators Act." *Id.*

• In **2003**, Congress enacted the Prosecution Remedies and Other Tools to End the Exploitation of Children Today Act (the "PROTECT Act"), which established a mandatory minimum sentence for trafficking and increased the statutory maximum sentences for both trafficking and possession offenses. *Id.* at 962 (citation omitted). "In the PROTECT Act, Congress–for the first time and the only time to date–made direct amendments to the Guidelines." *Id.* (citation omitted). Congress added to the possession guideline an enhancement of four levels for images of sadistic or masochistic conduct, and for all offenses increased to up to five levels the enhancement for the number of images. *Id.*

• Finally, to conform to the new mandatory minimum and higher statutory maximums imposed by the PROTECT Act, the Commission in **2004** raised the child pornography based offense levels across the board, including raising the base offense level for possession from 15

to 18. *Id.* "In sum, the child pornography Guidelines have been substantively revised nine times during their 23 years of existence. Most of the revisions were congressionally-mandated and not the result of an empirical study." *Id.*[1] As explained by the Commission itself, this has made it "'difficult to gauge the

---

[1] Even more problematically, these revisions were "the result of arbitrary increases by Congress slipped into other bills, often with little or no rebate, resulting in direct amendments to the guidelines." *United States v. Hanson,* 561 F. Supp.2d 1004, 1009 (E.D. Wis. 2008) (citation omitted).

The reasons for the judiciary's treatment and skepticism towards the child pornography guidelines is clear. The guidelines for child pornography offenses have increased dramatically over the years. In nearly every instance, these increases were mandated by Congress, often over the objection of the Sentencing Commission. *See Henderson*, 649 F.3d at 960-62. When possession of child pornography was criminalized in 1990, the Sentencing Commission created a new guideline for that offense, with a base offense level of 10 and a 2-level enhancement for material involving a prepubescent minor. *Id.* (citations omitted). Congress, however, was not satisfied, and in 1991, "over the objection of the Commission," Congress directed the Commission to increase penalties for child pornography offenses. *Id.* at 960. Among other changes, Congress "explicitly ordered the Commission" to increase the base offense levels to 15 (for receipt, transportation, and trafficking) and 13 (for possession). *Id.* at 960-61. Congress demanded further increases in 1995, increasing the base offense level by 2 levels and adding a 2-level enhancement for use of a computer. *Id.* When the Commission submitted a report to Congress that was critical of the Congressionally mandated two-level computer enhancement because "it failed to distinguish serious commercial distributors from more run-of-the-mill users," Congress "responded with legislation that directed the Commission to add enhancements for the use of a computer to persuade, induce, entice, coerce or facilitate the transport of a child; to increase penalties in any case in which the defendant engaged in a pattern of activity; and to clarify that distribution included distribution for nonpecuniary gain." *Id.* at 961 (citations omitted). With the enactment of the 2003 PROTECT Act, "Congress – for the first time and the only time to date – made direct amendments to the Guidelines." *Id.* (citation omitted). These amendments included an enhancement for images of sadistic or masochistic conduct and a range of enhancements based upon the number of images. *Id.*

15

effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress.'" *Id.* (citation omitted).

Accordingly, the Ninth Circuit in *Henderson* held that, "similar to the crack cocaine Guidelines, districts courts may vary from child pornography guidelines, § 2G2.2, based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Id.* at 963 (citations and footnote omitted).

As Judge Berzon noted in her forceful concurrence, "an unduly deferential application of § 2G2.2 will lead to the vast majority of offenders being sentence to near the statutory maximum term," which "stands in significant tension with a sentencing judge's duties 'to consider every convicted person as an individual.'" *Id.* at 965 (quoting *Gall*, 552 U.S. at 52). Second, it notes as an "illogical" result that "§ 2G2.2 often recommends longer sentences for those who receive or distribute images of minors than the applicable Guidelines recommend for those who actually engage in sexual conduct with minors." *Id.* (citing *Dorvee*). Finally, it suggests that "[d]istrict judges who, after having considered § 2G2.2, conclude that it constitutes bad advice should be encouraged to reject it as such." *Id.* at 966 (citing *Kimbrough*). Along these lines, the Court may find that an analysis of the effect of § 2G2.2 on Mr. Fischman's' case demonstrates why the Court can reject the guidelines here, even, as a starting point

16

for this sentencing computation. Indeed, a district court "commits procedural error when it fails to appreciate its *Kimbrough* discretion to vary from the child pornography Guidelines based on a categorical disagreement with them," *Id.* at 964.

In finding as it did, the Ninth Circuit joined numerous other courts that reached this same conclusion. *See, e.g., United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (holding that § 2G2.2 is "fundamentally different" from other Guidelines and that, unless it is "applied with great care, it can lead to unreasonable sentences that are inconsistent with what § 3553 requires"); See also *United States v. Grober,* 624 F.3d 592, 608-09 (3d Cir. 2010) (holding that § 2G2.2 was not developed pursuant to the Commission's characteristic institutional role and that district courts may vary on a policy basis from it); *United States v. Tutty*, 612 F.3d 128, 131 (2d Cir. 2010); *United States v. Stone,* 575 F.3d 83, 90 (1st Cir. 2009); *United States v. Brasfield,* 2011 WL 3844181 (E.D. Wis. Aug. 29, 2011) at *3 (holding that § 2G2.2 is "a seriously flawed provision worthy of little deference"); *United States v. Ontiveros*, 2008 WL 2937539 at *8 (E.D. Wis. 2008); *United States v. Baird,* 580 F. Supp.2d 889, 895 (D. Neb. 2008).

In sum, the child pornography guidelines have been substantively revised nine times during their 23 years of existence. Most of the revisions were Congressionally mandated and

were not the result of an empirical study. As the Commission itself has explained, "The frequent mandatory minimum legislation and specific directives to the Commission to amend the [G]uidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress." *Id*. (citation omitted).[2] The changes to § 2G2.2 recounted in *Henderson* dramatically increase Mr. Fischman's sentencing range under the Guidelines.[3] As indicated in the table below, had Mr. Fischman been sentenced for the same conduct when the Guidelines first were adopted for possession charges in 1990, his Guideline range, with the adjustment for acceptance of responsibility, would have been 6-12 months in Zone B, authorizing a sentence of probation with a condition of home confinement. *See* U.S.S.G. § 5C1.1(c)(3). Nevertheless, Mr. Fischman's sentencing range for the same conduct under the current Guidelines, even with his acceptance of responsibility and a record of no prior criminal convictions of any kind, pushes up against & exceeds the 10 year statutory maximum for the offense of conviction.

---

[2] Not only were these revisions mandated without regard for the Commission's input, but many were "the result of arbitrary increases by Congress slipped into other bills, often with little or no debate." *United States v. Hanson*, 561 F. Supp. 2d 1004, 1009 (E.D. Wis. 2008).

[3] In 1997, child pornography offenders received a mean sentence of 20.59 months. *Stabenow* Report.

**Sentencing Ranges under Various Iterations of the Guidelines, 1987 to the Present[4]**

|                                  | 1987 | 1990 | 1991  | 1996   | 2000  | 2003  | since 2004 |
|----------------------------------|------|------|-------|--------|-------|-------|------------|
| base offense                     | –    | 10   | 13    | 15     | 15    | 15    | 18         |
| victim under 12                  | –    | +2   | +2    | +2     | +2    | +2    | +2         |
| # of images                      | –    | –    | +2    | +2     | +2    | +5    | +5         |
| computer use                     | –    | –    | –     | +2     | +2    | +2    | +2         |
| sadism/masochism                 | –    | –    | –     | –      | –     | +4    | +4         |
| acceptance                       | –    | -2   | -3    | -3     | -3    | -3    | -3         |
| Distribution[5]                  | –    |      |       |        | +2    | +2    | +2         |
| **Guideline range (Criminal History I)** | –    | 6-12 | 15-21 | 27-33* | 27-33 | 70-87 | 97-121     |

As cautioned in *Henderson,* deference to the calculation of the sentencing range under the current Guidelines is in tension with the Court's duty to consider every convicted person as an individual, since each of these enhancements that apply to Mr. Fischman's also apply to virtually every defendant against whom these charges are filed. *See Henderson,* 649 F.3d at 965 (Berzon, J., concurring). Along these lines, one district court has explained:

---

[4] These computations are based on the chronology in *Henderson* and the summary table of child-pornography Guidelines changes that is attached to the Stabenow report.

[5]  These calculations are presented to the Court without a comprehensive analysis of the increase under Distribution Offense Characteristics which contains its own convoluted and tangled history of Congressional interference with the role of the Sentencing Commission.

> [T]he enhancements for use of a computer and images
> containing children under age twelve are typical of this
> crime. Further, given the unfortunate ease of access to
> this type of material in the computer age, compiling a
> collection with hundreds of images is all too easy, yet
> carries a 5 level enhancement, which in this case nearly
> doubled the range. . . . The other large enhancement
> defendant received—4 levels for portrayal of sadistic
> conduct—applies whether or not the person specifically
> intended to possess such material, *see* U.S.S.G. § 2G2.2
> cmt. n.2, which seems an odd way of measuring
> culpability.

*Hanson*, 561 F. Supp. 2d at 1009. According to the U.S. Sentencing Commission's fiscal year 2010 figures,[6] the percentage of child pornography defendants who received the exact same enhancements as Mr. Fischman's receives are as follows:

> § 2G2.2(b)(2) victim under the age of 12 years (2 levels): 95.6% of defendants

> § 2G2.2(b)(4) sadistic/masochistic or other violence (4 levels): 73.6% of defendants

> § 2G2.2(b)(6) use of a computer (2 levels): 96.2% of defendants

> § 2G2.2(b)(7)(D) 600 images or more (5 levels): 66.9% of defendants

As these statistics demonstrate, the child pornography Guideline fails to distinguish the most serious from the least serious offenders because nearly all defendants are routinely

---

[6] *Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2010*, available at http://www.ussc.gov/Data_and_ Statistics/Federal_Sentencing_Statistics/Guideline_Application_Fre quencies/2010/10_glinexgline.pdf, at 37–39, *cited in Henderson*, 649 F.3d at 965 (Berzon, J.,concurring).

subject to every enhancement, rendering them effectively meaningless.[7]

The escalating guideline ranges in child pornography cases have caused "widespread dissatisfaction" among district court judges. *United States v. Apodaca*, 641 F.3d 1077, 1083 (9th Cir. 2011) (citing U.S.S.C., *Results of Survey of United States District Judges January 2010 through March 2010* (2010) ("Judicial Survey"), available at http://www.ussc.gov/sites /default /files /pdf/research-andpublications/research-projects-and-surveys/ surveys/20100608_Judge_Survey.pdf.) For example, 71% of the federal judges surveyed in 2010 believed that the mandatory minimum sentence for receipt of child pornography was too high, and 70% believed that the guidelines for possession of child pornography offenses were too high. *See* Judicial Survey, *supra*. The judiciary's discomfort with the child pornography guidelines is reflected in the sentences imposed. In fiscal year 2015, approximately 28% of the sentences imposed nationwide were within the advisory § 2G2.2 guideline range. *See* U.S.S.C, 2014 Sourcebook of Federal Sentencing Statistics (2015) at Table 28, available at

---

[7] This illogical result was predicted by the Commission in 2004. *See Hanson*, 561 F. Supp. 2d at 1010 ("As noted by the Guidelines Commission, there are 'several specific offense characteristics which are expected to apply in almost every case (e.g., use of a computer, material involving children under 12 years of age, number of images).") (quoting Amendment 664 to United States Sentencing Guidelines (Nov. 1, 2004)).

http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-andsourcebooks/2014/Table28.pdf. Conversely, 70% of sentences imposed were below the guidelines. *Id.*

In light of these numerous deficiencies, Judge Jack Weinstein of the Eastern District of New York eloquently explains why the child pornography guidelines are so offensive to our system of justice:

> Prosecution under the current sentencing framework has largely failed to distinguish among child pornography offenders with differing levels of culpability and danger to the community. The applicable structure does not adequately balance the need to protect the public, and juveniles in particular, against the need to avoid excessive punishment, with resulting unnecessary cost to defendants' families and the community, and the needless destruction of defendants' lives. One of the Foundational rules of our criminal justice system is that punishment should be commensurate with the crime—its threat to society. The need to tailor sentences to the dangers and needs of the individual being sentenced (and his family and community) are also foundational. Proportionality in sentencing encourages a fair system. Increasingly, judges, prosecutors, advocates and concerned citizens have recognized that the current sentencing approach to child pornography offenders is often unfair, unreasonable, cruel, and conceptually deficient.

*R.V.*, 2016 WL 270257, at *1-2.

For these reasons, Courts in this District have understood and followed the reasoning of *Henderson* in varying substantially below the sentencing guidelines. If the Court wishes, we can cite to and describe these cases in detail but are hesitant to do so now because of space limitations. Suffice to say Courts in the

22

District, as elsewhere, have recognized the profound deficiencies in these particular Guidelines we have discussed herein.

**B. The Relevant Sentencing Factors in § 3553 Militate in Favor of a Sentence Well Below the Sentencing Guidelines and Lower than that Recommended by the United States Probation Office**

As we said at the outset, the offense is a serious one and it is necessary that the sentence imposed by the Court take this into account. The history and characteristics of the defendant, however, weigh heavily in his favor.  In the first section of this memorandum we have set forth in detail Mr. Fischman's devotion to the causes of affordable housing and eradication of breast cancer as well as his commitment to his family and community. He is clearly a person with a profound sense of responsibility and integrity.  His word is trusted.  He is esteemed by those who have known him for decades as well as by more recent acquaintances. Given the letters submitted to this Court and Dr. Welch's comprehensive report, there is little reason to believe that the defendant will commit further crimes or that he must be deterred from doing so by a harsh sentence here. Additionally, there are numerous factors, commonly cited as departures or variances from the Sentencing Guidelines which argue against a long sentence for Mr. Fischman.

**1. Post-Offense Rehabilitation**

One such factor is post-offense rehabilitation, which is abundantly clear in Mr. Fischman's case. As Dr. Welch's report

states, Mr. Fischman sought help from him almost immediately after the search warrant that initiated this case was served at his home. (Dr. Welch Report to be filed under seal as Exhibit C). Long before any charges were brought against him, Mr. Fischman was seeing Dr. Welch for intensive therapy three times per week. According to Dr. Welch, Mr. Fischman has been consistently candid and open about this offense, which has left him guilty and mortified with a strong desire to succeed in understanding the roots of his problem. Dr. Welch makes clear that Mr. Fischman has made tremendous progress and continues to see the doctor for therapy twice a week. He concludes that Mr. Fischman represents no risk to others, either now or in the future, that he has no predatory tendencies and that his therapy, which is ongoing, has been successful. In addition, since the search warrant was executed at his home, and following the death of his wife, Mr. Fischman has immersed himself in the cause of breast cancer awareness, with funding and treatment options. He was instrumental in setting up BCOT, and without him Ms. Marshall could not have gotten it off the ground.  The Pre-Sentence Report details the things Mr. Fischman has done post-offense (see para. 72) and makes reference to his ongoing treatment by Dr. Welch.

In *Pepper v. United States*, the Supreme Court emphasized that evidence of post-sentencing rehabilitation may be highly relevant to several of the § 3553(a) factors. Such evidence, the Court

24

said: may also be pertinent to "the need for the sentence imposed" to serve the general purposes of sentencing set forth in § 3553(a)(2) – in particular, to "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training ... or other correctional treatment in the most effective manner." §§ 3553(a)(2)(B)-(D); see *McMannus*, 496 F.3d, at 853 (Melloy, J., concurring) ("In assessing ... deterrence, protection of the public, and rehabilitation, 18 U.S.C. § 3553(a)(2)(B)(C) & (D), there would seem to be no better evidence than a defendant's post-incarceration conduct"). *Pepper v. United States*, 131 S. Ct. 1229, 1242 (2011). Additionally, the Court found that "post-sentencing rehabilitation may also critically inform a sentencing judge's overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary' to comply with the sentencing purposes set forth in § 3553(a)(2)." *Id*.

Equally significant for Mr. Fischman's case, the Court indicated that:

> Post sentencing conduct also sheds light on the likelihood that he will engage in future criminal conduct, a central factor that district courts must assess when imposing sentence. See §§ 3553(a)(2)(B)-(C); *Gall*, 552 U.S., at 59, 128 S.Ct. 586 ("Gall's self-motivated rehabilitation ... lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts" (citing §§ 3553(a)(2)(B)-(C)). Finally, Pepper's

25

exemplary post-sentencing conduct may be taken as the most accurate indicator of "his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him." *Ashe*, 302 U.S., at 55, 58 S.Ct. 59. Accordingly, evidence of Pepper's post-sentencing rehabilitation bears directly on the District Court's overarching duty to "impose a sentence sufficient, but not greater than necessary" to serve the purposes of sentencing. § 3553(a).

*Id*. at 1242-43.

For precisely the same reasons, Mr. Fischman's self-motivated, post-arrest rehabilitation "lends strong support to the conclusion that imprisonment is not necessary to deter him from engaging in future criminal conduct, or to protect the public from his future criminal acts." It may also be taken as "the most accurate indicator of his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him." Mr. Fischman has clearly demonstrated that he is truly repentant and has achieved real gains in rehabilitating himself and changing his behavior. He has also shown that this offense represents a marked deviation from an otherwise law-abiding life.

### 2. Aberrant Behavior

Additionally, Mr. Fischman's offense conduct was aberrant behavior in the context of his life. Even though the conduct went on for a considerable period of time, it was aberrant in the sense that it was completely different from everything else he did in his personal and professional life. That is why everyone who

communicated with the Court expressed sincere shock and surprise at discovering this flawed behavior in someone they knew and trusted.   The discovery did not undermine their trust because they were confident in the Arnold Fischman they had come to know as a caring, kind and compassionate person, devoted to improving the human condition whenever able to do so.   In other words, the arc of Mr. Fischman's life demonstrates that there is "little likelihood that the defendant will commit other crimes." USSG § 4A1.3(b)(1).   This factor has been held to support a downward variance.   See *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007)(re-offense unlikely); *United States v. Stall,* 81 F.3d 276, 279 (6th Cir. 2009).

### 3.   Difficult Childhood/Lack of Youthful Guidance

The Ninth Circuit has determined that extraordinary childhood abuse and lack of guidance as a youth may be mitigating factors which render a defendant less culpable. *See, e.g. United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991); *United States v. Walter*, 256 F.3d 891 (9th Cir. 2001).

The Pre-Sentence Report (see Justification, p. 40 and para's 61-67), and Dr. Welch's comprehensive report detail the abnormal and harmful conditions during Mr. Fischman's childhood.   The Probation Officers identified these conditions as a factor that may in the officer's view warrant a lower sentence.   (PSR, para. 129).

### 4.   Community Service and Employment History

We have detailed Mr. Fischman's positive contributions to the community.  The Probation Officer, in the Justification portion of the sentencing recommendation states that, in addition to Arnie's dysfunctional childhood and lack of criminal history, his "community service, and employment history with non-profit affordable housing agencies are factors that warrant a sentence below the Guideline range." (PSR, p. 41).  We respectfully agree with this assessment.  Mr. Fischman has been singularly unselfish and even altruistic throughout his professional life.  Countless families live in decent, dignified housing because of him.  It is entirely appropriate for the Court to take this into consideration in considering the sentence to be imposed on Mr. Fischman.

## III. The Pre-Sentence Report

Throughout this memorandum we have discussed various aspects of the pre-sentence report.  We appreciate the conscientious work of the Probation Officer in compiling this report and accurately detailing important aspects of Mr. Fischman's life and work. Our comments on the report are few and not of great moment.  In paragraph 118 and in the ultimate recommendation, it is recommended that Mr. Fischman pay an additional special assessment of $5,000 pursuant to 18 U.S.C. § 3104.  That Section was enacted on May 29, 2015, and constitutes punishment (see Section 2015) and thus constitutes an *ex post facto* law if applied to the defendant.

Thus, he was not arraigned on this matter nor was it included in the plea agreement. We submit, and we believe the government agrees, that the provision does not apply to this defendant.

In paragraph 74 it was reported that Mr. Fischman hoped to attend his great-nephew's Bar Mitzvah in New York City in January 2017. As it transpired, the government voiced an objection to this travel so he did not go.

**IV. The Court's Sentencing Discretion Should Reflect Mr. Fischman's Enormous and Ongoing Contributions to the Public Good, the Integrity and Compassion with Which He Has Lived His Life, and His Significant Post-Offense Rehabilitation**

We have set forth in detail Mr. Fischman's contributions and the esteem in which he is held by those who know him best and these factors should bear considerable weight in the sentencing determination. Of course it must also reflect the seriousness of the offense conduct herein, recognizing that child pornography has victims and that a defendant should be held accountable for such offenses. Here, Mr. Fischman has come to terms with the negative aspects of his conduct, has sought and engaged in intensive therapy to provide insight into the underlying causes of his offense conduct, and has in other ways demonstrated sincere remorse and regret. His statement, quoted in the Pre-Sentence Report, is thoughtful and accepts full responsibility for the offense conduct. On the other hand, those who rely on his guidance, compassion and expertise are very concerned at the

prospect of his departure from their lives from any appreciable period of time.

Without in any way denigrating the seriousness of the offense, we believe that a sentence well below the Guideline and below even the five years proposed by the Probation Officer is appropriate in this unique case. Without presuming to intrude upon the Court's distortion in this regard, we trust in the Court's wisdom in structuring an appropriate sentence in Mr. Fischman's case. Whatever that sentence may be, Mr. Fischman fully accepts it and reaffirms his acceptance of responsibility in this case. There is little doubt that through the remainder of his life he will continue along the positive path he has charted for nearly seven decades and he will certainly not reoffend.

With respect to restitution, we agree that restitution is appropriate for the victim who has appeared through counsel.  The parties are in agreement that a $5,000 restitution order is appropriate.

**CONCLUSION**

Mr. Fischman's case reminds us once again of the complexity of the human mind, such that the perverse thoughts and actions present in this offense conduct can coexist, even in small part, with a long life characterized by kindness, compassion, public service, and integrity.  It is not easy to plumb such mysteries and it is of great importance that Mr. Fischman himself has

undertaken a long course of intense self-examination and treatment under the guidance of a highly qualified professional. Mr. Fischman has assured the Court that he will never reoffend and Dr. Welch fully supports that commitment.  We respectfully ask that the Court, upon due consideration, impose a sentence that fully reflects these qualities and that commitment.

Dated:  February 7, 2017       Respectfully submitted,


                                 /s/ William L. Osterhoudt
                                WILLIAM L. OSTERHOUDT


                                 /s/  Gail Shifman
                                GAIL SHIFMAN

                                Attorneys for ARNOLD FISCHMAN