1  DAVID L. ANDERSON (CABN 149604)
   United States Attorney
2

3  HALLIE HOFFMAN (CABN 210020)
   Chief, Criminal Division
4

5  THOMAS R. GREEN (CABN 203480)
   Assistant United States Attorney
6
        1301 Clay Street, Suite 340S
7       Oakland, California 94612
        Telephone: (510) 637-3680
8       FAX: (510) 637-3724
        thomas.green@usdoj.gov
9
10 Attorneys for United States of America

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                       OAKLAND DIVISION

14

15 UNITED STATES OF AMERICA,              )  CASE NO. 16-00246 HSG
                                          )
16            Plaintiff,                  )  UNITED STATES'S OPPOSITION TO
                                          )  DEFENDANT'S MOTION FOR A REDUCTION IN
17       v.                               )  SENTENCE
                                          )
18 ARNOLD FISCHMAN,                       )
                                          )
19            Defendant.                  )
                                          )
20 _____)

21

22

23

24

25

26

27

28

1

<u>TABLE OF CONTENTS</u>

2   INTRODUCTION ……………………………………………………….......…….…1

3   RELEVANT BACKGROUND …………………………………………………………2

4   I.  DEFENDANT'S PLEA AGREEMENT BARS A MOTION FOR A
5   SENTENCING REDUCTION UNDER 18 U.S.C. § 3582.…………………….........6

6   II.  THIS COURT PRESENTLY LACKS JURISDICTION TO MODIFY
    DEFENDANT'S SENTENCE. …………………………………………….…..8

7   III.  REDUCTION OF DEFENDANT'S SENTENCE IS NOT WARRANTED….. 16

8   A.  Applicable law……………………………………………..…………16
9
10   B.  Defendant remains a danger to the community…………………………..19

11   C. COVID-19 does not present "extraordinary or compelling reasons" to
    reduce Defendant's sentence…………………………………………….... 22

12
13   IV.  BOP HAS EXCLUSIVE AUTHORITY TO TRANSFER AN INMATE TO HIS
    OR HER HOME FOR THE REMAINDER OF HIS OR HER SENTENCE OF
14   IMPRISONMENT…………………………………………………………….. 26

15   V.  DEFENDANT HAS NOT PRESENTED AN ADEQUATE PLAN FOR HIS
    RELEASE…………………………………………………………………….. 27

16   VI.  CONCLUSION…………………………………………………………...29

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

<u>Cases</u>

3

2020 WL 1307108 (D. Conn. Mar. 19, 2020) ................................................................. 12

4

2020 WL 1450745 (N.D. Cal. Mar. 25, 2020) ..................................................... 12, 16, 23

5

*Barron v. Ashcroft*, 358 F.3d 674 (9th Cir. 2004) ........................................................ 10

6

*Bowles v. Russell*, 551 U.S. 205 (2007) ......................................................................... 9

7

*Dillon v. United States*, 560 U.S. 817 (2010) ................................................................ 8

8

*Eberhart v. United States*, 546 U.S. 12 (2005) ............................................................. 9

9

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) ....................................................... 9

10

*McCarthy v. Madigan*, 503 U.S. 140 (1992) ................................................................. 10

11

*McKart v. United States*, 395 U.S. 185 (1969) .............................................................. 13

12

*New York v. Ferber*, 458 U.S. 747 (1982) ..................................................................... 21

13

*Reeb v. Thomas*, 636 F.3d 1224 (9th Cir. 2011) ..................................................... 18, 27

14

*Ross v. Blake*, 136 S. Ct. 1850 (2016) ........................................................................... 13

15

*Shaw v. Bank of America Corp.*, 946 F.3d 533 (9th Cir. 2019) ..................................... 12

16

*Shields*, 2019 WL 2359231 .............................................................................................. 24

17

*Tapia v. United States*, 564 U.S. 319 (2011) ........................................................... 18, 27

18

*Teague v. Lane*, 489 U.S. 288 (1989) ............................................................................. 8

19

*United States v. Addonizio*, 442 U.S. 178 (1979) .......................................................... 8

20

*United States v. Ayon-Nunez*, 2020 WL 704785 (E.D. Cal. Feb. 12, 2020) ................. 18

21

*United States v. Buenrostro*, 895 F.3d 1160 (9th Cir. 2018) ......................................... 9

22

*United States v. Carver*, No. 4:19-CR-06044-SMJ, 2020 WL 1604968 (E.D. Wash. Apr. 1, 2020)....... 12

23

*United States v. Ceballos*, 671 F.3d 852 (9th Cir. 2011) ............................................... 27

24

*United States v. Charles*, 581 F.3d 927 (9th Cir. 2009).................................................. 7

25

*United States v. Cortez-Arias*, 425 F.3d 547 (9th Cir. 2005)....................................... 7, 8

26

*United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016).................................................... 9

27

28

*United States v. Devinna*, 5 F. Supp. 2d 872 (E.D. Cal. 1998) ................................................ 21

*United States v. Ebbers*, 2020 WL 91399 (S.D.N.Y. Jan. 8, 2020) ................................... 14, 15

*United States v. Eidson*, 2019 WL 3767570 (N.D. Cal. Aug. 9, 2019) ..................................... 7

*United States v. Goff*, 501 F.3d 250 (3d Cir. 2007) .............................................................. 21

*United States v. Greenhut*, 2020 WL 509385 (C.D. Cal. Jan. 31, 2020) .................................. 18

*United States v. Holden*, No. 3:13-CR-00444-BR, 2020 WL 1673440 (D. Or. Apr. 6, 2020)..... 10, 11, 12

*United States v. Johns*, 2019 WL 2646663 (D. Ariz. June 27, 2019) ....................................... 19

*United States v. Kidder*, 869 F.2d 1328 (9th Cir. 1989) ......................................................... 26

*United States v. Lo*, 839 F.3d 777 (9th Cir. 2016) ................................................................... 8

*United States v. MacEwan*, 445 F.3d 237 (3d Cir. 2006) ....................................................... 21

*United States v. Malone*, 503 F. App'x 499 (9th Cir. 2012) ................................................ 7, 8

*United States v. Mangarella*, 2020 WL 1291835 (W.D.N.C. Mar. 16, 2020) ........................ 18

*United States v. Martin*, 2020 WL 1274857 (D. Md. Mar. 17, 2020) .................................... 22

*United States v. Quinones*, 2017 WL 2929452 (N.D. Cal. Jul. 10, 2017) ................................. 7

*United States v. Raia, __ F.3*, d __, 2020 WL 1647922 (3d Cir. Apr. 3, 2020) ........................ 11, 14, 23

*United States v. Reiner*, 468 F.Supp.2d 393 (E.D.N.Y. 2006) ............................................... 21

*United States v. Sahlin*, 399 F.3d 27 (1st Cir. 2005) ............................................................... 8

*United States v. Shields*, 2019 WL 2645028 (N.D. Cal. June 27, 2019) ................................. 18

*United States v. Smartt*, 129 F.3d 539 (10th Cir. 1997) .......................................................... 9

*United States v. Sprague*, 135 F.3d 1301 (9th Cir. 1998) ...................................................... 18

*United States v. Sumner*, 210 F. Supp. 3d 21 (D.D.C. 2016) ................................................... 9

*United States v. Wages*, 271 F. App'x 726 (10th Cir. 2008) ................................................. 23

*United States v. Washington*, 549 F.3d 905 (3d Cir. 2008) ..................................................... 8

*United States v. Weidenhamer*, 2019 WL 6050264 (D. Ariz. Nov. 8, 2019) .......................... 18

*United States v. Willingham*, 2019 WL 6733028 (S.D. Ga. Dec. 10 ...................................... 16

*Washington v. Barr*, 925 F.3d 109 (2d Cir. 2019) ................................................................ 13

*Weinberger v. Salfi*, 422 U.S. 749 (1975)............................................................................................ 13

Statutes

18 U.S.C. § 2252.......................................................................................................................................... 2

18 U.S.C. § 3142(g).............................................................................................................................. 16, 19

18 U.S.C. § 3142(g)(1)............................................................................................................................... 20

18 U.S.C. § 3582.................................................................................................................................. passim

18 U.S.C. § 3582(1)(A)............................................................................................................................... 9

18 U.S.C. § 3582(c).................................................................................................................................... 9

18 U.S.C. § 3582(c)(1)........................................................................................................................... 9, 10

18 U.S.C. § 3582(c)(1)(A).................................................................................................................. passim

18 U.S.C. § 3582(c)(2)............................................................................................................................... 9

18 U.S.C. § 3624(c).................................................................................................................................... 26

18 U.S.C. § 3624(c)(1)................................................................................................................................ 3

18 U.S.C. §§ 3621(b) & 3624(c)................................................................................................................ 27

18 U.S.C. 4205(g)...................................................................................................................................... 10

28 U.S.C. § 2255.......................................................................................................................................... 7

28 U.S.C. § 994(t)................................................................................................................................ 16, 19

42 U.S.C. § 1997e(a)................................................................................................................................... 13

Pub. L. 116-136........................................................................................................................................... 3

U.S.C. § 2241.............................................................................................................................................. 7

Rules

United States Sentencing Guidelines (USSG) § 1B1.13 ................................................................... passim

Regulations

28 C.F.R. § 542.15(a)................................................................................................................................. 11

28 C.F.R. § 571.61..................................................................................................................................... 10

28 C.F.R. § 571.62(a)................................................................................................................................. 14

# INTRODUCTION

The novel coronavirus is spreading broadly among the U.S. population, including among members of the public, healthcare providers, law-enforcement officers, people who produce and deliver essential products, and those who carry out the functions of the federal, state, and local government. Both because of illness and because of efforts to avoid having people become infected, the Covid-19 pandemic is limiting the functions of essential businesses and government.   Against that backdrop, Defendant seeks his release from prison under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i) as a means to control the spread of Covid-19 within prison.  But his request should be rejected.  Using compassionate release in his case would fail to address a range of important practical and legal problems, the standards in § 3582(c)(1)(A), and the purposes of sentencing in § 3553(a).

Defendant Arnold Fischman is currently 36 months into serving a 70-month sentence for his conviction of possession of child pornography.  He has been in the custody and care of the Bureau of Prisons ("BOP") at FCI Terminal Island since the outset of his custodial term.  He has an anticipated release date of March 16, 2021, only four years after starting service of his sentence, on account of credit for good time served and completion of the RDAP program.  He seeks to reduce the sentence previously imposed by this Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  Dkt. 47.[1]  The government opposes Defendant's motion on three bases.  First, Defendant waived such a post-conviction attack in his plea agreement.  Second, Defendant has not exhausted his administrative remedy before seeking

---

[1] Defendant filed both his substantive motion and his motion to shorten time on Friday evening, April 10, 2020, with the first ECF filing at approximately 5:05 p.m.  A supporting declaration was filed at approximately 5:59 p.m., which asserts that defense counsel contacted government counsel to discuss the motion but that government counsel had not responded.  The government is not aware of any effort to reach government counsel to discuss the requested relief or any motion being filed until an email was sent to the undersigned AUSA at approximately 5:58 p.m., attaching the just filed brief and declaration. Government counsel responded to that email upon seeing the email, approximately 30 minutes later. The government trusts that the characterization in the declaration that the government had not responded to defense counsel's effort to discuss the brief or motion shortening time was an oversight, or that defense counsel intended to contact government counsel sooner, but lacked the time to do so under the circumstances.  Government counsel only points this out to clarify that the government was unaware of the motions being filed, or an intent to file the motions, until after they were filed.

such relief.  Third, Defendant has not met the high bar of showing he substantively warrants such relief.  Although COVID-19 is a global pandemic, it does not constitute an "extraordinary and compelling" reason "warrant[ing]" Defendant's immediate release from custody or a reduction of Defendant's sentence amounting to probation or supervised release with conditions such as home confinement.  This Court should deny Defendant's motion.

## RELEVANT BACKGROUND

**I.      DEFENDANT'S CRIMINAL CONDUCT AND PROCEDURAL BACKGROUND**

Defendant was charged with possession of child pornography in violation of 18 U.S.C. § 2252, on June 10, 2016.   Dkt. #1.

On September 19, 2016, Defendant was convicted when he pled guilty to a single count of possession of child pornography pursuant to a Rule 11(c)(1)(B) plea agreement.  Among other things, Defendant's plea agreement included Defendant waiving his right to move for relief under 18 U.S.C. § 3582.  Dkt. #20 at ¶5.

Defendant's conviction was based on various facts defendant admitted in the plea agreement, including:

- Defendant's possession of more than 600 images of child pornography, many including children under the age of 12 engaged in sexually explicit conduct.

- Defendant's possession of sadistic and masochistic child pornography, including bondage of children and penetration of prepubescent children.

- Defendant's use of the internet to send images of children engaged in sexually explicit conduct to other persons.

The U.S. Probation Office's Presentence Investigation Report ("PSR") further described the extent of defendant's known conduct.  Defendant maintained a massive collection of images and videos depicting the sexual assault of children.  The PSR reported that defendant possessed in excess of 10,000 images and 150 videos of child pornography.  *See* PSR at ¶27.  More than 100 different child victims

1  were identified in defendant's collection, some of whom shared the tragic circumstances of their abuse

2  in submissions to the Court, the Probation Office and the parties in connection with sentencing.  *See id.*

3  The PSR also detailed Defendant's chat sessions in which he communicated with girls and others

4  purporting their interest in girls.  Defendant chatted about his own sexual abuse of children with under-

5  aged girls, including claiming to have had a "3 som" with a 14 year old girl.  *See id.* at ¶¶ 7-8 and 22-25.

6       On February 28, 2017, this Court sentenced Defendant to 70 months in prison, five years of

7  supervised release, a $15,000 fine and $5,000 in restitution.  The Court ordered Defendant to self-

8  surrender on March 27, 2017.  Defendant is presently serving his sentence at FCI Terminal Island in

9  California, with a projected release date of March 16, 2021.  http:bop.gov/inmateloc.

10  **II.      BOP AUTHORITY TO ASSIGN PRISONERS TO COMMUNITY CONFINEMENT**

11       The BOP is authorized to assign a prisoner to a community correctional facility during the last

12  twelve months of his custodial sentence, and to place a prisoner in home confinement for the shorter of

13  10 percent of his term of imprisonment or 6 months.  18 U.S.C. § 3624(c)(1) & (2).  The Attorney

14  General has directed the Director of the BOP to prioritize granting home confinement to eligible inmates

15  who are especially vulnerable to COVID-19 based on their age and underlying health conditions, where

16  home confinement would be more effective in protecting their health, and not present a great risk to

17  public safety.  Att'y Gen. Memo. (Mar. 26, 2020).  The Attorney General has also invoked his

18  emergency authority to "lengthen the maximum amount of time for which the Director is authorized to

19  place a prisoner in home confinement under the first sentence of section 3624(c)(2)."  Coronavirus Aid,

20  Relief, and Economic Security Act (CARES Act), Pub. L. 116-136, 134 Stat. 281, § 12003(b)(2) (March

21  27, 2020).  BOP is evaluating all inmates for placement in home confinement, with priority given to

22  those most vulnerable to COVID-19 and those at facilities most affected by COVID-19.  Att'y Gen.

23  Memo. (April 3, 2020).  BOP has increased home confinement by over 40% since March.  *See*

24  https://www.bop.gov/resources/news/ 20200405_covid19_home_confinement.jsp.

25  //

26

27

28

III.    **DEFENDANT'S KNOWN HEALTH CIRCUMSTANCES**

Defendant is presently 72 years old.  The PSR noted that Defendant reported that "he is generally healthy as he has no serious or chronic illnesses."  Defendant reports in his motion that he felt dizzy and short of breath after using the stairs in the first month of his incarceration, which was approximately three years ago, in April 2017.  He further reports that he was diagnosed with atrial fibrillation and has received periodic tests which have confirmed that diagnosis.  He also reports that BOP accommodated his medical condition by placing him on the ground floor and providing him with lighter footwear.  Defendant also reports that that he has received periodic testing since his diagnosis while in the care of the BOP.  He reports that the testing has confirmed the diagnosis.  Defendant does not report having experienced any symptoms in the past three years since his diagnosis.

The U.S. Attorney's Office has just obtained possession of Defendant's medical records while in the care of the BOP.  Those records are being processed, will be produced to the defendant, and filed in whole or in part as an under seal exhibit to this motion as possible following making necessary redactions to the records.  Defendant's medical records since coming under the care of BOP physicians appear to align with Defendant's health as reported in his motion.  Among other things, they reflect the following events and observations during his care:

- 3/29/17 – appears to be a listing of conditions as of incarceration, including atrial fibrillation diagnosis in December 2016 (p. 260)
- 4/6/17 – vision screening (p. 263)
- 11/22/17 – no symptoms, no chest pain, no shortness of breath, no stroke and no heart attack prior to diagnosis of atrial fibrillation in December 2016.  Advised to take low dosage aspirin, which appears to be the only medication advised to date (p. 1)
- 11/8/18 – reported itching on legs (p. 250)
- 1/16/19 – "all unremarkable" (p. 251)

- 1/6/20 – mentions he is sometimes short of breath when climbing stairs, otherwise fine, EKG ordered (p. 251-53)

- 2/13/20 – frontal and lateral views compared with 2/7/19 radiographs showing "no radiograph evidence for an acute cardiopulmonary process" and "no change in radiograph appearance of the chest compared to the prior exam."

- 3/4/20 – lab work and EKG performed (p. 265-70)

- 4/10/20 – asymptomatic person in quarantine (p. 260)

In totality, the medical records demonstrate that defendant is receiving routine medical care while in the custody of BOP, including but not limited to periodic doctor appointments and testing to assess the state of his atrial fibrillation.

The government has not had time to research atrial fibrillation in any depth in response to this motion.  The government provides the following resource to the Court which may provide a basic understanding of the condition:

- https://www.cdc.gov/heartdisease/atrial_fibrillation.htm.  The Center for Disease Control website states:  "Atrial fibrillation, often called AFib or AF, is the most common type of treated heart arrhythmia. An arrhythmia is when the heart beats too slowly, too fast, or in an irregular way. . . .  It is estimated that between 2.7 million and 6.1 million people in the United States have AFib. . . .  AFib increases a person's risk for stroke. . . .  Treatment for AFib can include:
  - Medicines to control the heart's rhythm and rate
  - Blood-thinning medicine to prevent blood clots from forming and reduce stroke risk
  - Surgery
  - Medicine and healthy lifestyle changes to manage AFib risk factors

Atrial fibrillation does not appear to be heart disease, and it is not clear to government counsel based on the quick review possible whether atrial fibrillation is a "serious heart condition" as that phrase

1   is used by the CDC when it lists such persons as being at heightened risk of health complications if they

2   contract the coronavirus.  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-

3   at-higher-risk.html.

4           Based on defendant's motion and a rushed review of his medical records, it does not appear that

5   Defendant has report having experienced any stroke, blood clots or other symptoms of atrial fibrillation

6   since his initial diagnosis, aside from shortness of breath at times when walking up stairs.  It is not clear

7   to undersigned counsel to what extent a diagnosis of atrial fibrillation, particularly if treated, makes

8   someone more at risk to complications from contracting the coronavirus.  But given defendant's age, the

9   government understands that defendant is at greater risk of complications based on his age alone in any

10  event, and that his atrial fibrillation may place defendant at greater risk.

11  **IV.    DEFENDANT'S REQUESTS FOR EARLY RELEASE TO THE BOP**

12          It appears that defendant first made a request for early release to home confinement on April 5,

13  2020.[2]  His lawyer makes reference to such a communication in an April 7, 2020 letter to the Warden of

14  FCI Terminal Island.  Dkt. #47-4.  Without conceding whether Defendant's referenced April 5

15  communication or the April 7 communication of his lawyer were legally sufficient to initiate an

16  administrative process by which BOP should consider defendant's request for early release to home

17  confinement, this opposition brief assumes that Defendant' April 5, 2020 was sufficient to initiate such

18  an administrative review by the BOP.

19                                          **ARGUMENT**

20  **I.      DEFENDANT'S PLEA AGREEMENT BARS A MOTION FOR A SENTENCING
             REDUCTION UNDER 18 U.S.C. § 3582.**

21

22          Defendant seeks early release under 18 U.S.C. § 3582(c)(1)(A) on the ground that his age and

23  health place him at extreme risk of severe illness from coronavirus.  However, Defendant is barred by

24

25  _____

26          [2] Government counsel has not seen that communication, and reserves the right to contest the
    sufficiency of that communication at any time.

27

28

1    his plea agreement with the government from seeking relief under § 3582.  He weighed the benefits and

2    the risks of pleading guilty to a crime he committed, and expressly waived the right to file any motion

3    attacking his sentence and waived the right to seek any relief under 18 U.S.C. § 3582.  He was advised

4    as to the rights he was giving up by pleading guilty and pled guilty after being so advised, agreeing:  "I

5    agree not to file any collateral attack on my conviction or sentence, including a petition under 28 U.S.C.

6    § 2255 or 28 U.S.C. § 2241 . . . I also *agree not to seek relief under 18 U.S.C. § 3582*." (emphasis

7    added)."  Dkt. #20 at ¶5.

8         A waiver of rights under § 3582 "is enforceable if (1) the language of the waiver encompasses

9    the relief sought, and (2) the waiver is knowingly and voluntarily made." *United States v. Malone*, 503

10   F. App'x 499, 500 (9th Cir. 2012) (unpublished) (citing *United States v. Charles*, 581 F.3d 927, 931

11   (9th Cir. 2009)).  In *Malone*, the Ninth Circuit reversed a district court order granting a § 3582 sentence

12   reduction where the defendant waived the right to seek § 3582 relief in his plea agreement.  *Id.*  The

13   Ninth Circuit has similarly upheld analogous waivers in plea agreements where the language is

14   unrestricted and the waiver was knowing and voluntary because "[t]he record shows that the government

15   upheld its end of the deal[]" and thus "[t]he United States is entitled to the benefit of its bargain."

16   *United States v. Cortez-Arias*, 425 F.3d 547, 548 (9th Cir. 2005).  Courts in this district have enforced

17   § 3582 waivers in plea agreements.  *See United States v. Eidson*, 2019 WL 3767570, at *2 (N.D. Cal.

18   Aug. 9, 2019) (relying on identical plea agreement waiver of § 3582 relief); *United States v. Quinones*,

19   2017 WL 2929452, at *2 (N.D. Cal. Jul. 10, 2017) (quoting and relying on *Malone*).

20        Defendant understood when he entered the plea agreement that he was giving up the right to seek

21   a sentence reduction under § 3582.  The First Step Act did not change the basic structure of the right to

22   post-conviction relief under § 3582 that existed prior to its enactment—an inmate must still apply first to

23   the BOP for relief and may apply to the court only after exhausting all administrative rights to appeal.

24   That Congress expanded the right to relief under § 3582 does not invalidate Defendant's waiver.  *See*

25   *Cortez-Arias*, 425 F.3d at 548 (the "fact that [defendant] did not foresee the specific issue he now seeks

26

27

28

1   to appeal does not place the issue outside the scope of his waiver" (citation omitted)).  "[T]he possibility

2   of a favorable change in the law occurring after a plea is one of the normal risks that accompany a guilty

3   plea."  *Id.* (quoting *United States v. Sahlin*, 399 F.3d 27, 31 (1st Cir. 2005)).  "[A] favorable change in

4   the law does not entitle a defendant to renege on a knowing and voluntary guilty plea."  *Id.*

5        Courts interpret plea agreements, including waiver provisions, according to contract principles.

6   *United States v. Lo*, 839 F.3d 777, 783 (9th Cir. 2016).  To determine a waiver's scope, courts examine

7   its express language.  *Id.* at 784–85.  Here, the language of the waiver in Defendant's plea agreement

8   squarely prohibits him from seeking relief under § 3582.  Defendant makes no argument that his waiver

9   was not knowingly and voluntarily made.  Nor is there anything in the record that would excuse him

10   from this waiver, such as "claims involving breach of the plea agreement, racial disparity in sentencing

11   among codefendants or an illegal sentence imposed in excess of a maximum statutory penalty."

12   *Malone*, 503 F. App'x at 500.  Defendant's plea agreement waiver of the right to seek § 3582 relief

13   should be enforced.  His motion should be denied on the ground of waiver alone.

14   **II.**    **THIS COURT PRESENTLY LACKS JURISDICTION TO MODIFY DEFENDANT'S**
15         **SENTENCE.**

16        This Court lacks authority to act on Defendant's motion at this time because he has not

17   exhausted his administrative rights, as required under 18 U.S.C. § 3582(c)(1)(A).

18        "'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final

19   judgment' and may not be modified by a district court except in limited circumstances."  *Dillon v.*

20   *United States*, 560 U.S. 817, 825 (2010).  As the Supreme Court has recognized, finality is an important

21   attribute of criminal judgments, and one "essential to the operation of our criminal justice system."

22   *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion).  Accordingly, it is well established that

23   once a district court has pronounced sentence and the sentence becomes final, the court has no inherent

24   authority to reconsider or alter that sentence.  Rather, it may do so only pursuant to statutory

25   authorization.  *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v.*

26

27

28

*Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

18 U.S.C. § 3582(c) provides three narrow exceptions to the rule of finality, only the first of which is relevant here. 18 U.S.C. § 3582(c)(1)–(2); *see also United States v. Sumner*, 210 F. Supp. 3d 21, 22–23 (D.D.C. 2016) (denying defendant's motion to reduce sentence where he did not meet any of the three exceptions provided in § 3582(c)). 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part that the court "may not modify a term of imprisonment once it has been imposed except" upon a defendant's motion "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier," where such a reduction also meets other specified requirements. 18 U.S.C. § 3582(1)(A).

Unless Defendant meets these administrative exhaustion requirements, this Court lacks jurisdiction to modify Defendant's sentence. Section 3582(c) states that a "court may not modify" a term of imprisonment except in enumerated circumstances. It thus "speak[s] to the power of the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (citation omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'" *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). Indeed, the Ninth Circuit has held that a defendant's failure to meet the requirements of 18 U.S.C. § 3582(c)(2) means that the district court lacks jurisdiction to reduce the defendant's sentence. *United States v. Buenrostro*, 895 F.3d 1160, 1164 (9th Cir. 2018); *United States v. Davis*, 825 F.3d 1014, 1019–20 (9th Cir. 2016) (en banc).

Even if the exhaustion requirement of Section 3582(c)(1)(A) were not jurisdictional, it is at least a mandatory claim-processing rule and must be enforced if a party "properly raise[s]" it. *Eberhart*, 546

U.S. at 19 (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a nonjurisdictional but mandatory claim-processing rule).  "'Where Congress specifically mandates' it, exhaustion is not merely appropriate but 'required.'"  *Barron v. Ashcroft*, 358 F.3d 674, 677 (9th Cir. 2004) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)); *see also United States v. Holden*, No. 3:13-CR-00444-BR, 2020 WL 1673440, at *6–10 (D. Or. Apr. 6, 2020) (providing a detailed analysis why statutory exhaustion requirements such as here are mandatory, even in the midst of the COVID-19 crisis, and distinguishing contrary district court cases).  The government raises the rule here, and it must be enforced.

The BOP regulation, 28 C.F.R. § 571.61, implementing Section 3582(c)(1)(A) provides in relevant part:

> § 571.61 Initiation of request – extraordinary or compelling circumstances.
>
> a. A request for a motion under 18 U.S.C. 4205(g) or 3582(c)(1)(A) shall be submitted to the Warden.  Ordinarily, the request shall be in writing, and submitted by the inmate.  An inmate may initiate a request for consideration under 18 U.S.C. 4205(g) or 3582(c)(1)(A) only when there are particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing.  The inmate's request shall at a minimum contain the following information:
>
> (1) The extraordinary or compelling circumstances that the inmate believes warrant consideration.
>
> (2) Proposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment.

28 C.F.R. § 571.61.  In addition, BOP's Program Statement setting forth procedures for implementing Section 3582 states: "A request for a RIS is considered 'submitted' for the purposes of 18 U.S.C. § 3582(c)(1), when received by the Warden in accordance with this section."  See https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

1      Here, it is not clear that Defendant has filed an administrative motion with the warden.

2   Defendant's motion makes reference to defendant writing to the Warden at FCI Terminal Island on

3   April 5, 2020 to seek a reduction in his sentence pursuant to section 3582(c)(1), but the letter or email is

4   not an exhibit to defendant's motion.  *See Holden*, 2020 WL 1673440, at *4–5 (finding defendant's

5   request to the warden for home confinement did not trigger the start of the 30-day window for

6   exhaustion purposes under Section 3582(c)(1)(A)).

7      But even assuming *arguendo* that Defendant's writing constitutes an administrative motion, the

8   motion was only sent nine days ago as of the filing of this brief.  The U.S. Attorney's Office is not aware

9   of the Warden ruling on the request, and the 30 day time period afforded to do so is three weeks from

10  expiring.[3]

11     The COVID-19 pandemic, while presenting urgent and serious concerns, does not allow this

12  Court to circumvent the statute's administrative requirements.  As the Third Circuit recently

13  emphasized: "the mere existence of COVID-19 in society and the possibility that it may spread to a

14  particular prison alone cannot independently justify compassionate release, especially considering

15  BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."  *United

16  States v. Raia*, __ F.3d __, 2020 WL 1647922 (3d Cir. Apr. 3, 2020) (denying motion for compassionate

17  release and refusing to remand to district court because any remand would be futile since defendant did

18  not exhaust his administrative remedies).  District Court Judges in the Northern District of California

19  facing similar motions in response to the coronavirus have similarly ruled that defendants must exhaust

20  their administrative remedy within the BOP before seeking relief in the District Court.  *See United

21

22

23        [3] If the warden denies the requested compassionate release, Defendant may appeal the warden's
    denial to the BOP "Regional Director within 20 days of the date the Warden signed the response," as
24  required by 28 C.F.R. § 542.15(a).  If the BOP Regional Director and been denied, he would have then
    have had the administrative right to appeal that denial to the BOP General Counsel.  28 C.F.R. §
25  542.15(a).  "Appeal to the General Counsel is the final administrative appeal."  *Id.*  Defendant concedes
    that he has not exhausted all administrative appeals in the multi-stage administrative appeal process.

26

27

28

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR A REDUCTION IN SENTENCE
CR 16-00246 HSG                              11

1  *States v. Hembry et al.*, No. 12-cr-00119-SI-1, Dkt. 1723 (N.D. Cal. Apr. 10, 2020); *United States v.*

2  *Jones*, No. CR 17-070 VC, Dkt. 93 (N.D.Cal. Apr. 10, 2020).

3        Numerous other courts have also recognized that COVID-19 does not excuse the administrative

4  requirements of 18 U.S.C. § 3582(c)(1)(A).  *United States v. Shah*, No. 10-70-CJC, ECF No. 329, at 3

5  (C.D. Cal. Mar. 30, 2020) ("Because defendant failed to exhaust his administrative remedies, his request

6  for compassionate release based on COVID-19 concerns fails.");  *United States v. Sloane*, No. 19-CR-

7  10117-IT-11, ECF No. 647, at 2 (D. Mass. Mar. 19, 2020) (noting no request made to the USP Lompoc

8  Warden, and that absent such exhaustion, the court "does not have authority to grant the requested

9  relief"); *United States v. Gileno*, No. 19-CR-161-VAB-1, 2020 WL 1307108, at *3–4 (D. Conn. Mar.

10  19, 2020) (denying COVID-19-based compassionate-release motion for lack of exhaustion); *United*

11  *States v. Eberhart*, No. 13-CR-00313 PJH, Dkt. 64, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020)

12  (same); *United States v. Robinson*, No. 18-CR-00597 RS, Dkt. 29 (N.D. Cal. Mar. 24, 2020) (same);

13  *United States v. Neman*, No. 14-521-JAK, ECF No. 863, at 4—6 (C.D. Cal. Mar. 30, 2020) (same).

14  Although "it is indisputable that the COVID-19 outbreak is unprecedented and poses a heightened risk

15  to those in this nation's prisons and jails, [but] absent congressional action to relieve inmates of the

16  exhaustion requirement [of Section 3592(c)(1)(A), this Court] is unable to provide the relief Defendant

17  seeks."  *Holden*, 2020 WL 1673440, at *10; *see United States v. Carver*, No. 4:19-CR-06044-SMJ, 2020

18  WL 1604968, at *1 (E.D. Wash. Apr. 1, 2020).

19        While *judicially*-created exhaustion requirements may sometimes be excused by judge-created

20  exceptions, it is well settled that a court may not ignore a *statutory* command such as that presented in

21  Section 3582(c)(1)(A).  *Shaw v. Bank of America Corp.*, 946 F.3d 533, 541 (9th Cir. 2019) ("[T]the

22  Supreme Court has made clear that if exhaustion 'is a statutorily specified prerequisite'—as opposed to

23  a judicially created one—'[t]he requirement is . . . something more than simply a codification of the

24  judicially developed doctrine of exhaustion, and may not be dispensed with merely by a judicial

25

26

27

28

1   conclusion of futility[.]'" [4] (quoting *Weinberger v. Salfi*, 422 U.S. 749, 755 (1975)).

2       Citing *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019), Defendant argues that the

3   exhaustion requirement of § 3582(c)(1)(A) may be excused by a court as "futile" during the present

4   pandemic.  But *Washington v. Barr* only addressed a judicially created exhaustion requirement.  *See id*.

5   And in any event, a request in this context is not futile, because, as explained further below, BOP fully

6   considers requests for compassionate release.  As one can imagine, the BOP is presently inundated with

7   such requests, and it is processing those requests as efficiently as it is able.

8       The Supreme Court reaffirmed these principles in *Ross v. Blake*, 136 S. Ct. 1850 (2016), in

9   which the Court rejected a judicially created "special circumstances" exception to the exhaustion

10  requirement stated in the Prison Litigation Reform Act of 1995 (PLRA).  That Act mandates that an

11  inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison

12  conditions. 42 U.S.C. § 1997e(a).  Rejecting the "freewheeling approach" adopted by some courts of

13  appeals, under which some prisoners were permitted to pursue litigation even when they had failed to

14  exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Court demanded fidelity to the

15  statutory text, explaining that the "mandatory language" of the exhaustion requirement "means a court

16  may not excuse a failure to exhaust" even to accommodate exceptional circumstances, *id.* at 1856.  The

17  Court stated:

18          No doubt, judge-made exhaustion doctrines, even if flatly stated at first,
            remain amenable to judge-made exceptions.  *See McKart v. United States*,
19          395 U.S. 185, 193 (1969) ("The doctrine of exhaustion of administrative
            remedies . . . is, like most judicial doctrines, subject to numerous
20          exceptions").  But a statutory exhaustion provision stands on a different
            footing.  There, Congress sets the rules—and courts have a role in creating
21          exceptions only if Congress wants them to.  For that reason, mandatory
            exhaustion statutes like the PLRA establish mandatory exhaustion
22          regimes, foreclosing judicial discretion.
    *Id.* at 1857.
23

24  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [4]  Even if the administrative exhaustion requirements of Section 3582(c)(1)(A) were not a jurisdictional
25  prerequisite, this Court should decline to waive those requirements.  Defendant has not shown that it
    would be futile to try and seek relief through the BOP or that the relief he seeks would be meaningless if
26  he had to wait 30 days.

27

28

BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations based on an inmate's background and medical history, and more general considerations regarding the conditions and needs at particular facilities. The provision of Section 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. As the Third Circuit stated, "[g]iven BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 2020 WL 1647922, at *2. Thus, even if this Court could ignore the mandatory exhaustion requirement, which it cannot, it would be imprudent to prevent BOP from engaging in that review.

Giving the BOP a first chance to evaluate any motion for early release under Section 3582(c)(1)(A) is not only required, it is good policy. The Bureau of Prisons conducts an extensive assessment for such requests. *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. As the Procedures reflect, BOP completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. BOP is better situated[5] than the courts to make an initial evaluation of defendants' requests for early release for it maintains defendants' relevant medical and behavioral records, and has expertise in assessing the safety and health of their inmates and managing the administration of their facilities. The BOP also has a variety of administrative procedures available for addressing COVID-19-based concern.

Unfortunately and inevitably, just as many in the general populace have contracted COVID-19, some BOP inmates have become ill and more will likely become ill in the weeks ahead. But the solution

---

[5] Until the First Step Act's recent enactment, the BOP had exclusive authority to adjudicate such claims. Notably, the First Step Act did not change the factors relevant to whether and how the Court should modify a defendant's sentence, only the procedures by which a defendant can raise such claims. United States v. Ebbers, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020).

1   is not to exclude BOP from reviewing applications for compassionate release.  There are many

2   challenging factors to consider during this unprecedented pandemic, and BOP should have the

3   opportunity to assess those factors during the statutorily required review period.  For example,

4   notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced

5   criminals to protect the public.  It must consider the effect of a mass release on the safety and health of

6   both the inmate population and the citizenry.  It must marshal its resources to care for inmates in the

7   most efficient and beneficial manner possible.  It must assess release plans, which are essential to ensure

8   that a defendant has a safe place to live and access to health care in these difficult times.  And it must

9   consider myriad other factors, including the availability of transportation for inmates (at a time that

10  interstate transportation services often used by released inmates are providing reduced if any service),

11  and of supervision of inmates once released (at a time that the Probation Office has necessarily cut back

12  on home visits and supervision).

13          In addition, BOP has been granted wider authority to designate inmates for home confinement in

14  its toolkit of available measures.  Indeed, BOP has taken rapid steps to increase the number of inmates

15  placed on home confinement.  This effort involves the assessment of inmates for vulnerabilities to

16  COVID-19 according to CDC Guidelines and determination of suitability.  As of April 5, 2020, BOP

17  had increased home confinement by over 40% since March and continued to "aggressively screen all

18  potential inmates" for eligibility, without any need by the inmate to apply for consideration—"all

19  inmates" were being "urgently review[ed]" for home confinement.  *See*

20  https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp.  And since the release

21  of Attorney General Barr's original memo to the Bureau of Prisons on March 26, 2020 instructing the

22  BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP

23  has placed an additional 566 inmates on home confinement.  *Id.*

24          For all of these reasons, the BOP is best positioned to determine the proper treatment of the

25  inmate population as a whole, taking into account both individual considerations based on an inmate's

26

27

28

background and medical history, and more general considerations regarding the conditions and needs at particular facilities.  The Court should only become involved in an appellate posture or if BOP cannot review a request in 30 days.  Indeed, for this Court to evaluate a defendant's medical reasons for release, this Court should review the BOP's medical records for that defendant.  Exhaustion cannot—but also should not—be excused.  *Eberhart*, 2020 WL 1450745, at *2 (declining to excuse failure to exhaust COVID-19 compassionate-release motion); *Neman*, No. 14-521-JAK, ECF No. 863, at 6 (same).  The Court should thus dismiss Defendant's motion for lack of jurisdiction.  At minimum, the Court should stay consideration of the motion until the BOP has completed its administrative review.

## III.    REDUCTION OF DEFENDANT'S SENTENCE IS NOT WARRANTED.

### A.    Applicable law

This Court may only reduce a sentence pursuant to 18 U.S.C. § 3582(c)(1)(A) if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," the Court "finds that" either "extraordinary and compelling reasons warrant such a reduction," or the defendant is at least 70 years old and has served at least 30 years in prison, "and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."[6]

The pertinent policy statement is set forth at United States Sentencing Guidelines (USSG) § 1B1.13.  It prohibits this Court from reducing a defendant's sentence unless the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."[7]

---

[6]  Congress explicitly gave authority to the Sentencing Commission to further describe what conduct would authorize a court to order a compassionate release.  Specifically, 28 U.S.C. § 994(t) states that the Sentencing Commission "shall describe what should be considered extraordinary and compelling reasons for sentence reduction" under § 3582(c)(1)(A), "including the criteria to be applied and a list of specific examples."  The statute also states that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."  28 U.S.C. § 994(t).

[7]  While district courts disagree about whether the First Step Act alters the binding nature of USSG § 1B1.13, "the limited statutory exceptions to the general rule of finality of judgment" counsels in favor of following the Sentencing Commission's guidance, as one judge of this Court recently did when faced with a similar motion.  *Eberhart*, 2020 WL 1450745, at *2; *see also United States v. Willingham*, 2019

The Sentencing Commission also provided explicit examples of what constitutes an "extraordinary and compelling circumstance":

    (A)    **Medical Condition of the Defendant.**—

        (i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

        (ii)    The defendant is—

            (I)    suffering from a serious physical or medical condition,

            (II)    suffering from a serious functional or cognitive impairment, or

            (III)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

    (B)    **Age of the Defendant** — The Defendant is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the ageing process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment; whichever is less.

    (C)    **Family Circumstances.** —

        (i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.

        (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or the registered partner.

    (D)    **Other Reasons.** — As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

USSG § 1B1.13 cmt. n.1.

Thus, in order to qualify for compassionate release, a defendant must be able to demonstrate one of the listed reasons in (A)–(C) above or demonstrate some other condition that *in the discretion of the*

---

WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019) (collecting cases).

1   *Director of BOP* qualifies for compassionate release. *See United States v. Shields*, 2019 WL 2645028,

2   at *2 (N.D. Cal. June 27, 2019).  In turn, BOP promulgated Program Statement 5050.50, amended

3   effective January 17, 2019, to set forth its own internal criteria for evaluating compassionate release

4   requests. *See* https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  The Attorney General's recent

5   memorandum also sets forth specific criteria for the BOP to use in making determinations for potential

6   candidates for home confinement due to COVID-19.  Att'y Gen. Memo. at 1–2 (Mar. 26, 2020).  And,

7   in utilizing the discretion granted him under the CARES Act, the Attorney General expanded this

8   mandate to all inmates.  Att'y Gen. Memo. at 1–2 (Apr. 3, 2020).  Courts have frequently upheld BOP's

9   discretionary authority in its management duties over federal prisoners. *See Tapia v. United States*,

10  564 U.S. 319, 331 (2011) ("When a court sentences a federal offender, the BOP has plenary control,

11  subject to statutory constraints, over [the place of imprisonment and treatment programs].");  *Reeb v.*

12  *Thomas*, 636 F.3d 1224, 1226 (9th Cir. 2011) ("Congress delegated to the BOP the duty to manage and

13  regulate all federal penal and correctional institutions.").

14        A defendant bears the burden to show special circumstances meeting the high bar set by

15  Congress and the Sentencing Commission for compassionate release to be granted. *See United States v.*

16  *Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020) (holding that defendant bears the burden of

17  establishing entitlement to sentencing reduction and citing *United States v. Sprague*, 135 F.3d 1301,

18  1306-07 (9th Cir. 1998)).  As district courts addressing these claims have noted:  "To be faithful to the

19  statutory language requiring 'extraordinary and compelling reasons,' it is not enough that Defendant

20  suffers from . . . chronic conditions that [he] is not expected to recover from.  Chronic conditions that

21  can be managed in prison are not a sufficient basis for compassionate release." *United States v. Ayon-*

22  *Nunez*, 2020 WL 704785, at *2–3 (E.D. Cal. Feb. 12, 2020) (rejecting a claim for compassionate release

23  from a defendant suffering from severe back injuries and epilepsy) (quoting *United States v.*

24  *Weidenhamer*, 2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019)).  Compassionate release is "rare" and

25  "extraordinary" and courts routinely deny such claims. *United States v. Mangarella*, 2020 WL 1291835,

26

27

28

at *2–3 (W.D.N.C. Mar. 16, 2020) ("[A] compassionate release . . . is an extraordinary and rare event." (citation omitted)); *see United States v. Johns*, 2019 WL 2646663, at *2–3 (D. Ariz. June 27, 2019) (granting reduction for 81-year-old defendant with multiple serious medical conditions, including "severe heart disease" and a stroke, from which he is not likely to recover, and, after serving 23 years, had a substantially diminished ability to provide self-care within the BOP).

**B.    Defendant remains a danger to the community**

This Court may not reduce Defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." USSG § 1B1.13.  This record precludes such a finding.

Defendant's argument is that given his age, health, and good conduct in prison, this Court should conclude he no longer presents a danger or that any potential danger is outweighed by the risk he will contract COVID-19.  But many defendants do well in prison only to revert to crime upon their release, and many elderly defendants have years of good conduct in prison but may remain dangerous to the community.  The standard for compassionate release is not just whether someone is elderly and has performed well in prison.  *See* USSG § 1B1.13 app. note 3 ("Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement.")  Defendant must also show that he will not be a danger if released.  He cannot do so.

Recognizing that there is a significant difference between doing well in prison and doing well in society, this Court must look to the factors set forth in 18 U.S.C. § 3142(g).  Under § 3142(g), the Court must consider four factors in determining whether the defendant might present a danger:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court, and (4) the nature and seriousness of the danger to

1  any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g)(1)–(4).

2  Consideration of these factors—which are not affected by COVID-19—does not allow this Court to

3  conclude that Defendant is not a danger to the safety of any other person or the community.

4        The Court addressed all of these factors in one form or another when it sentenced defendant to

5  70 months in prison only three years ago.  Though that sentence represented a sentence below the

6  Guidelines range, it exceeded the 60 month recommendation of the U.S. Probation Office, and reflected

7  the serious nature of defendant's crime and the danger that persons such as defendant present to minor

8  children everywhere.

9        Defendant's motion pays short shrift to the nature of his crimes, the sentence he received and

10  simply asserts that his sentence has been sufficiently punitive and he no longer merits further

11  incarceration to meet the goals of section 3553(a).  The government respectfully disagrees, both with the

12  conclusion and the manner in which the defense asserts that Defendant has already served his time.  A

13  36 months sentence is not sufficient to assure the safety of the community or meet the sentencing

14  purposes of section 3553.  Possession of child pornography is not a victimless crime.

15        Defendant's dangerousness argument invites the Court to revisit arguments it specifically

16  rejected or already accounted for at sentencing.  Defendant's position today reflects arguments raised

17  and considered at sentencing, where defendant asked—as he does now—to serve his sentence in home

18  confinement.[8]  Indeed, the Court already accounted for defendant's acceptance of responsibility,

19  including his post-offense rehabilitation, by varying downward from the guideline range that otherwise

20  applied to his extensive and vile conduct.

21        As defendant's motion underscores, he still fails to recognize the danger and harm imposed on

22  the victims by virtue of his criminal conduct.  "Children are exploited, molested, and raped for the

23  prurient pleasure of [the defendant] and others who support suppliers of child pornography. These small

24

25  _____

26      [8] Defense counsel specifically requested a custodial term of no time at sentencing and argued
that defendant should at most be sentenced to 24 months in prison.

27

28

1   victims may rank as "no one else" in [the defendant's] mind, but they do indeed exist outside his mind.

2   Their injuries and the taking of their innocence are all too real."  *United States v. Goff*, 501 F.3d 250,

3   259 (3d Cir. 2007).  Defendant's conduct involved viewing and sharing child pornography and, while

4   there are no allegations of child molestation, "[t]he simple fact that the images have been disseminated

5   perpetuates the abuse initiated by the producer of the materials. 'The materials produced are a permanent

6   record of the children's participation and the harm to the child is exacerbated by their circulation.'"  *Id*.

7   at 259 (citing *New York v. Ferber*, 458 U.S. 747, 759 (1982)).

8       Child pornography possession and distribution offenses present a danger of "physical or

9   psychological harm, or both, to the children involved," and the "mere existence of and traffic in child

10  pornographic images creates the potential for many types of harm in the community and presents a clear

11  and present danger to all children."  *United States v. MacEwan*, 445 F.3d 237, 250 (3d Cir. 2006)

12  (internal quotation marks and citations omitted) (quoting Congressional record); *accord United States v.*

13  *Reiner*, 468 F.Supp.2d 393, 397 (E.D.N.Y. 2006) (concluding that possession of child pornography was

14  an "extremely serious charge[ ] that bear[s] directly on the issue of danger"); *United States v. Devinna*, 5

15  F. Supp. 2d 872, 873 (E.D. Cal. 1998) (considering release following guilty plea to child pornography

16  charge, and concluding that charge, "by definition, entails dangers to the community").

17      Despite the Court's recognition of the seriousness and harm associated with defendant's crime at

18  sentencing, even now defendant fails to acknowledge the true extent of his crimes, focusing on the same

19  psychologist's report opining that defendant "has led an exemplary life" and that his "possession of

20  pornography has not reflected any predatory interest in children at any time."  Dkt. 47 at p. 4.  But

21  defendant's own chat communications tell otherwise.  And the images and videos of children being

22  sexually abused that he took pleasure in paint a very different picture of the defendant, one that caused

23  the Court to sentence defendant to nearly six years in prison.

24      Defendant's crime has not changed, and nothing about the coronavirus changes the nature of his

25  crime or the danger that he represents.  As a father, defendant spent years searching out, saving, and

26

27

28

sharing thousands of images and videos depicting prepubescent children engaged in horrific and violent sex acts.  He committed his crimes with computers from his home, using sick aliases like "fingertips" to identify himself to the community he shared.  Now defendant asserts that the community is safe, that he has been rehabilitated after completing roughly half of his original term of his incarceration, and that he should be allowed to return to the same home where he committed his crimes in the past.  Defendant asserts that "he has a release plan that ensures a safe transition to the community."  Dkt. 47 at 30.  But the so-called release plan is not spelled out.  Nor has *any* release plan been endorsed by the BOP.  Nor has *any* release plan been endorsed by the U.S. Probation Office that would be charged with his supervision.

And because first responders are focused on mitigating the effects of the COVID-19 outbreak, they are less equipped to prevent and respond to wrongdoing.  Indeed, as a district court in Maryland recently observed, installation of location-monitoring tools now poses a risk to United States Pretrial Services officers "given the current recommendations regarding implementation of social distancing." *United States v. Martin*, 2020 WL 1274857 (D. Md. Mar. 17, 2020).  The U.S. Probation Office in this district is similarly limited.  It is not visiting defendants' homes, and it has limited monitoring devices to use for the increasing population it is serving across the district.

Defendant has not shown that his current medical condition or risk of COVID-19 (a risk that applies in the community as well) makes him less of a danger.  The defense presents no additional facts that meaningfully shift the balance of the § 3142(g) factors in Defendant's favor.

In sum, Defendant has failed to demonstrate that the § 3142(g) factors the Court considered at the time of detention or the § 3553(a) factors the Court considered at the time of sentencing have changed, and thus the Court should deny Defendant's motion for immediate release.

**C.      COVID-19 does not present "extraordinary or compelling reasons" to reduce Defendant's sentence**

Although the COVID-19 pandemic is an extraordinary world event, Defendant has failed to show that that its impact on him, specifically, constitutes "extraordinary and compelling reasons" warranting his immediate release pursuant to 18 U.S.C. § 3582(c)(1)(A).  Defendant does not meet any of the listed reasons in USSG § 1B1.13, nor can describe any particularized reason why he should be released apart from any other convicted defendant serving time in FCI Terminal Island.

As Chief Judge Hamilton recently held in this district, "General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement on compassionate release, U.S.S.G. §1B1.13." *Eberhart*, 2020 WL 1450745, at *2.  The Third Circuit echoed this principle in an appeal by an inmate at heightened risk because of his age (68) and health condition (Parkinson's Disease, diabetes, and heart issues):

> We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread. *See generally* Federal Bureau of Prisons, *COVID-19 Action Plan* (Mar. 13, 2020, 3:09 PM), https://www.bop.gov/resources/news/20200313_covid-19.jsp.

*Raia*, __ F.3d __, 2020 WL 1647922, at *2.

Courts have generally recognized that "it is a rare case in which health conditions present an 'exceptional reason'" to allow for release where detention would otherwise be warranted.  *See, e.g.*, *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (collecting pre-trial detention cases).  Despite the severity of the COVID-19 pandemic, Defendant's case is not one of those rare cases.

Defendant is not at greater risk of contracting the illness by virtue of his age or health.  Though he is at greater risk of becoming severely ill in the event of contracting the virus, his motion amounts to little more than an argument that all persons who are over the age of 65 should be released.

He has not argued that the facility is unequipped to provide appropriate medical treatment if he were to become sick. Indeed, the quantum of treatment he has received to date, reflected by 273 pages of medical records being generated for a largely healthy man, tell the opposite story. However serious his atrial fibrillation condition is, it has been treated seriously by doctors, health care providers and other employees of the FCI Terminal Island. Defendant has not therefore shown that release is necessary for the compelling reason of protecting his life.

Defendant has no exigent family circumstances. *See Shields*, 2019 WL 2359231, at *5 (denying claim for release to care for daughter with epilepsy where defendant's partner worked full-time in part because "if this Court were to conclude that [the daughter's] circumstances warrant a reduction in [defendant's] term of imprisonment, the same could be said of *any* inmate who has young children and a spouse who must work" (original emphasis)).

### i.   Defendant's facility has taken strong steps to avoid spread of COVID-19 and is equipped to provide necessary medical care should Defendant become sick

Given the publicly-reported community spread of COVID-19, it is not unlikely that Defendant will be exposed to COVID-19 through community transmission over the coming months regardless of his custodial status. *See*, *e.g.*, https://www.sfchronicle.com/health/article/Newsom-56-of-Californians-could-get-coronavirus-15144438.php. The BOP facility in which Defendant is incarcerated strictly controls outsiders' access, has taken significant measures to avoid the spread of COVID-19, and has a plan and the ability to respond to sickness.

Even before COVID-19, BOP had protocols in place to combat the spread of infectious diseases, which are known to be risks wherever large groups of people gather. In particular, BOP has existing significant quarantine and isolation protocols for infectious disease outbreaks. But BOP has also implemented and planned for special measures to combat COVID-19.

BOP, like every other jail and prison, has protocols in place to combat the spread of viruses like COVID-19. Indeed, BOP has been planning for potential coronavirus transmissions since January.

On March 13, 2010, BOP announced that it was implementing the Coronavirus (COVID 19) Phase Two Action Plan ("Action Plan") in order to minimize the risk of COVID-19 transmission into and inside its facilities. The Action Plan comprises several preventive and mitigation measures, including suspension of social visitation, internal inmate movements, legal visits, official staff travel, training, access by volunteers and many contractors; extensive screening of staff and inmates (including screening of all new inmates); quarantine; and modified operations to maximize social distancing as much as practicable. *See* Federal Bureau of Prisons, BOP Implementing Modified Operations, *available at* https://www.bop.gov/coronavirus/covid19_status.jsp. All new BOP inmates are screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined; symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures.

BOP has continued to implement more stringent protocols as events have unfolded. On March 31, 2020, BOP announced it had ordered implementation of Phase 5 of its COVID-19 Action Plan effective April 1, 2020. Phase 5 provides that "[f]or a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus." *See* https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp. Taken together, these measures should mitigate the risks of COVID-19 transmission.[9]

Defendant proposes that his son will do the shopping for defendant's groceries. It is not clear to what extent his son will be otherwise exposed to the community and the virus on account of his job or lifestyle. But there is no guarantee that defendant will be spared from the virus if living with his son.

---

[9] As of April 14, 2020, BOP reports 248 confirmed staff cases and 444 confirmed inmate cases currently housed in BOP custody—for a total of almost 700 people out of the approximately 200,000 people housed in or working at BOP facilities in the United States.[9] https://www.bop.gov/coronavirus/index.jsp (updating numbers and locations at 3:00pm each day). All of the inmates have been isolated and are receiving medical treatment. Only two staff and seven inmates have been tested as being positive for coronavirus at FCI Terminal Island in California.

Given that no persons will be admitted to BOP facilities without being screened for symptoms and risk of infection, the risk that Defendant will be infected simply as a result of his incarceration is not necessarily higher than his/her risk of infection upon release.

Defendant does not claim to be infected with COVID-19, or that he was denied necessary medical treatment or care for exposure to COVID-19 or for any other medical condition.  Nor can Defendant establish that should he contract COVID-19 while in custody, the facility would be unable to administer constitutionally acceptable treatment.  *Cf. United States v. Kidder*, 869 F.2d 1328, 1330–31 (9th Cir. 1989) (to prevail on Eighth Amendment claim regarding avoiding prison due to medical condition, defendant "must show that *no* constitutionally acceptable treatment can be provided while he is imprisoned" and collecting cases).

Finally, although the Court need not reach this issue, Defendant does not qualify for immediate release under § 3582 because under the Guidelines, a defendant must establish he is suffering from either a terminal illness or a "serious physical or mental condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  USSG § 1B1.13, cmt. n.1.  Those circumstances do not include a defendant being at higher risk of contracting a pandemic virus in prison, even if such a higher risk existed.

## IV.    BOP HAS EXCLUSIVE AUTHORITY TO TRANSFER AN INMATE TO HIS OR HER HOME FOR THE REMAINDER OF HIS OR HER SENTENCE OF IMPRISONMENT.

As discussed above, this Court does not have jurisdiction to modify Defendant's sentence under 18 U.S.C. § 3582(c)(1)(A), and even if it did, should not because Defendant does not present extraordinary and compelling reasons.

To the extent that Defendant asks the Court to simply redesignate him to serve the rest of his sentence in home confinement, this Court lacks the authority to do so.  The BOP has exclusive authority to place an inmate in home confinement pursuant to 18 U.S.C. § 3624(c), and in light of COVID-19, has

1    undertaken an urgent effort to evaluate all inmates for home confinement.

2    https://www.bop.gov/resources/news/20200405_covid19_home_

3    confinement.jsp.  While this Court may make a non-binding recommendation as to home confinement,

4    BOP's designation decision "is not reviewable by any court."  18 U.S.C. §§ 3621(b) & 3624(c); *see*

5    *Tapia v. United States*, 564 U.S. 319, 331 (2011) ("When a court sentences a federal offender, the BOP

6    has plenary control, subject to statutory constraints, over [the place of imprisonment and treatment

7    programs]."); *United States v. Ceballos*, 671 F.3d 852, 855 (9th Cir. 2011) (per curiam) ("The Bureau of

8    Prisons has the statutory authority to choose the locations where prisoners serve their sentence."); *Reeb*

9    *v. Thomas*, 636 F.3d 1224, 1226 (9th Cir. 2011) ("Congress delegated to the BOP the duty to manage

10   and regulate all federal penal and correctional institutions.").

11   **V.       DEFENDANT HAS NOT PRESENTED AN ADEQUATE PLAN FOR HIS RELEASE.**

12            In light of the risks posed by Defendant's proposed release—including the risks inherent in his

13   home confinement in Oakland—defendant does not, as he claims, have "a release plan that ensures a

14   safe transition to the community."  Dkt. #47 at 30.  Indeed, defendant's "plan" is very sparse, including

15   only his unspecified plan to return to his home and undergoing therapy with Dr. Welch.  As explained

16   above, defendant's release will increase the risk of exposure for defendant, his family, and anyone with

17   whom they come into contact, including court employees, like probation officers, who will be required

18   immediately interact with and supervise defendant under demanding conditions, likely for an extended

19   period of time.

20            Further, it is not clear that defendant's immediate release would afford him unrestricted access to

21   healthcare, including Dr. Welch and the unknown healthcare providers who may be required to treat

22   Defendant's underlying medical condition that is presently being cared for at the FCI Terminal Island,

23   including multiple doctor appointments and tests in the past few months.  According to the front page

24   banner on his website, Dr. Welch, JD, PhD, is a "Nationally prominent psychologist providing

25   psychotherapy, forensic expert witness services, and executive coaching."  https://bryantwelch.com/.

26

27

28

1   This bears the mark of a person hired by defense counsel as much as a person who provides counseling

2   to persons such as defendant.  To the extent he does provide the sort of counseling that the BOP or U.S.

3   Probation may require as part of a placement plan when the time is right for his release, it is unclear

4   whether Dr. Welch provides the type of service either agency would require.  Of additional concern is

5   the fact that his website, unlike most medical offices, does not appear to make any reference to the

6   coronavirus, or how patients can see him during the pandemic.   It is not apparent, either from

7   Defendant's motion or from Dr. Welch's website, whether or how Dr. Welch may be equipped to

8   provide Defendant with any counseling deemed necessary to his post-incarceration care.  Presently,

9   medical staff at FCI Terminal Island are seeing, assessing, and treating patients on a daily basis, while

10  wearing protective equipment and taking appropriate precautions.  It is simply not the case that

11  Defendant would have greater, unfettered access to medical care during this pandemic if released.

12          For all the reasons stated herein and at sentencing, the Court should not grant Defendant's

13  emergency motion for compassionate release.  Defendant's release would not occur in a vacuum, but

14  rather against the backdrop of significant practical and legal challenges.  He has not exhausted

15  administrative remedies.  And, compassionate release is not warranted.  Without waiving or conceding

16  its arguments against release, the United States nevertheless requests that, if the Court concludes that

17  release is warranted under § 3582(c)(1)(A), it order defendant to serve the remainder of his sentence on

18  home incarceration with electronic monitoring, and only after a sufficient plan has been addressed that

19  ensures the Defendant will have access to the same quantity of medical care he currently receives and

20  therapy that U.S. Probation would recommend and endorse.  Additionally, any release order should

21  require Defendant to submit to a 14-day quarantine period, administered by BOP, to mitigate his

22  unknowing exposure of others to the coronavirus.

23                                      **VI.   <u>CONCLUSION</u>**

24

25          Defendant entered into a plea agreement barring him from seeking relief under 18 U.S.C. § 3582,

26  did not exhaust his administrative right to seek the relief he desires from the BOP, and is a danger to

27

28

others.  He has not presented evidence of a serious medical condition that substantially impairs his ability to provide self-care or any other extraordinary or compelling reason to warrant a reduced sentence.  This Court should therefore deny Defendant's motion for immediate release under 18 U.S.C. § 3582(c)(1)(A)(i).

DATED:  April 14, 2020                                  Respectfully submitted,

                                                       DAVID L. ANDERSON
                                                       United States Attorney

                                                       _____/s/_____
                                                       THOMAS R. GREEN
                                                       Assistant United States Attorney

# EXHIBIT A

## NOTICE OF MANUAL FILING

Regarding: Manual Filing - Medical Records

This filing is in paper or physical form only, and is being maintained in the case file in the Clerk's office.   If you are a participant on this case, this filing will be served in hard-copy shortly.  For information on retrieving this filing directly from the court, please see the court's main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

The filing was not e-filed for the following reasons:

EXHIBIT A – Medical Records